Selden, Admr., Appellant, v. Metropolitan Life Insurance Company.

Argued April 23, 1945. Before BALDRIGE, P. J., RHODES, HIRT, RENO, DITHRICH, ROSS and ARNOLD, JJ.

*George H. Detweiler,* for appellant.

*Owen B. Rhoads,* with him *Barnes, Dechert, Price & Smith* and *Harry Cole Bates,* for appellee.

OPINION BY ARNOLD, J., July 19, 1945:

This was an action of assumpsit upon a policy of insurance on the life of Julius B. Selden. The verdict of the jury was for the plaintiff for only the premium paid, and thus for the defendant as to the $5000.00 principal sum. Plaintiff's motion for a new trial was overruled, judgment entered and plaintiff appealed.

Julius B. Selden was a detective, and much of his business concerned investigations of honesty of employes of large stores. He had many important customers. He maintained his office in the same suite as Jesse Douglass, a constable. On December 31, 1941, at about 2:00 A.M., his dead body was found on a couch in one of the offices. He was about twenty-nine years of age at the time of his death, which was the result of a gun shot wound through the right ear with close range powder burns.

Plaintiff's case was made out by proof of the policy and subsequent death of the insured. The defense was suicide, an excepted risk. This was the only issue, and the burden was on the defendant.

Defendant produced testimony of police officers concerning the position of Selden's body, and the surrounding facts at the time of its discovery. One witness testified that the deceased looked unwell a month before his death. The autopsy report of the Coroner (admitted by agreement) made no reference to suicide. Jesse Douglass, the constable, testified that he owned the revolver found at Selden's side and it, with a box of ammunition, was kept in an unlocked desk-drawer in another room of the suite. The revolver was a .38 caliber Colt. The insured met his death from the bullet of a .38 caliber cartridge. The defendant then rested.

Plaintiff, in rebuttal, offered evidence from which the jury might very well have determined that the insured was murdered. He was a detective and had been in a number of criminal cases, some of which were soon to be

tried. He had investigated numerous clerks in a number of large stores. In his business he was likely to make enemies. The plaintiff called eleven rebuttal witnesses adducing evidence tending to show, that the insured was young, strong and healthy; that his business was in excellent condition; that he appeared very happy particularly in the latter days of his life; that he had a strong desire to live and was shortly to be married to a woman of whom he was exceedingly proud; that he had made various engagements for the same day on which he died and had on the day before telephoned his fiancee in New York to be sure to bring a party dress for his party to her on January 1st (the day after his death); that within two days of his death he called friends and discussed with them arrangements for that party.

At the close of plaintiff's rebuttal matters arose which call for a reversal. They may be alluded to in narrative form. As *sur-rebuttal* defendant offered to prove by James Berger that Selden had declared to Berger his intention to commit suicide. On objection that it was not sur-rebuttal (which it plainly was not) defendant's counsel stated that Berger had been present in court before the close of the defendant's case but was excused until the next day, counsel believing defendant's testimony would run to greater length. It was the duty of the defendant to offer *all* of its testimony as to suicide, *before* the case passed to plaintiff for rebuttal. The defendant excused this witness, but he could have been called at the beginning of the defense. Because of the court's discretion in the order of proof, this might not be reversible error, but it was advantageous to defendant and detrimental to plaintiff.

Berger was then interrogated about conversations with Selden and recited nothing concerning any suicide declarations. Berger did not *help*, but certainly did not hurt, defendant. Defendant's counsel then pleaded "surprise," asking leave to cross-examine him. The

court declared, "He hasn't shown himself to be a 'hostile' witness." Defendant asserted "He has shown himself a very reluctant one." Without more, defendant's counsel was permitted freely to cross-examine his own witness relative to alleged declarations by the witness to counsel concerning suicide declarations of Selden. Defendant's counsel then testified that the day before the trial counsel told Berger that he would be called to testify "as to conversations with Selden threatening to take his own life," and that Berger had replied "That puts me on the spot but I wont lie." This was the whole and sole basis of the plea of surprise.

Defendant's counsel, immediately after testifying, offered to withdraw from the trial, which was waived. He thus observed the highest degree of professional propriety, and his conduct was above reproach.

Berger was further thus cross-examined about declarations allegedly made by him to Detectives Grace and Hopkins that Selden had said that he intended to commit suicide. These Berger denied. Defendant then called the two detectives who testified that Berger told them that Selden had stated to Berger that he intended to commit suicide,—which was bald hearsay.

Defendant deemed these matters helpful, insisting on their admission over objection, and by the same token they were undoubtedly harmful to the plaintiff.

The questions raised in this appeal all concern the rules as to the cross-examination and the impeachment of one's own witness. Such questions arise without warning, or an opportunity to examine the law. One does not get ready to be surprised. It is far easier to examine the law "in the unvexed silence of a student's cell," and to reach correct conclusions, than for court and counsel so to do in the midst of a heated trial. If court and counsel had had the opportunity to make such examination a different conclusion might have been reached.

Of course, all situations cannot be foreseen and what

follows treats those here involved.

I. The Plea of Surprise. This is the foundation for asking leave of court to cross-examine or to impeach one's own witness.[1]  It is placed upon the record *out of the hearing of the jury* by the suggestion of counsel setting forth the facts upon which the plea is based, usually a prior inconsistent statement. The plea should be made as soon as counsel is surprised, and not be allowed to wait until subsequent "surprises" follow. Opposing counsel may require amplification of the suggestion to meet or cover the peculiar situation at hand. The suggestion is the same as a side-bar offer of proof.

In the instant case counsel who pleaded surprise testified in the presence of the jury to the facts and circumstances constituting his plea. To do this permits the one witness to be impeached, and the other to give hearsay testimony, before the court has ruled on the plea. The matters of subsequent impeachment, and subsequent cross-examination are separate from, and follow, the plea of surprise if sustained.

II. Substance of the Plea. When the suggestion is completed the court has a reviewable judicial discretion whether the plea be sustained. This discretion is subject to certain limits and rules:

(1). "Surprise" does not mean "disappointment," but "taken (captured) unawares." The plea must show the prior statement or things upon which counsel relied and by which he was "taken unawares." Almost invariably the matter is an antecedent statement of the witness.

(2). The suggestion must show the *right* of counsel to rely upon such antecedent statement. Counsel may *not* rely on a prior *oral* statement of the witness unless made in the presence of the party calling him or his

---

[1] Such leave was emphatically refused in the impeachment trial of Warren Hastings, which became the leading authority that one may not impeach one's own witness.

counsel. Just as a jury is not permitted to rely upon the testimony of a witness that a third person told the witness that a party to the action made to the third person a certain declaration (pure hearsay), so counsel may not rely upon such hearsay in calling a witness.[2] Where the antecedent statement of the witness is in writing subscribed by him, or under oath (usually former testimony) the law treats this as a sort of continuing inducement and neither needs to have been made in the presence of the party or his counsel. The plea of surprise must rest upon some kind of a representation by the witness so the counsel was thereby induced to call him.

In the instant case counsel, therefore, had no right to rely upon any statement made by Detectives Grace and Hopkins as to any oral statement made by Berger to them.

(3). The antecedent statement must be contradictory of, or inconsistent with, the testimony of the witness taken *prior* to the plea of surprise. This is so because if it is not contradictory or inconsistent there is nothing about which to be surprised.

In the instant case, taking counsel's evidence as the suggestion, it appears that prior to trial counsel told Berger that he would be called to testify to suicide declarations made by Selden, and that Berger replied, "That puts me on the spot but I won't lie." Thus, Berger did *not* state that he had heard Selden make a suicide declaration. No statement by Berger to counsel was inconsistent with anything testified to by Berger prior to the plea. The statement "I won't lie" cannot be treated as contradictory to, or inconsistent with, Berger's testimony. This is true because every witness swears to tell the truth, and, of course, surprise cannot be predicated on the belief of counsel that the witness

---

[2] *Smith v. Briscoe,* (Md.) 5 A. 334; *Murphy v. State,* (Md.) 87 A. 811; *State v. Treseder,* (Utah) 244 Pac. 654.

is not telling the truth. Were it otherwise, the right of cross-examination of one's own witness would exist in every case where in the opinion of counsel the witness was untruthful in any degree, and in every case where counsel felt that more helpful testimony could be elicited by cross-examination rather than by direct examination. Since the actual *oath* of the witness cannot be the foundation, even less can be the unsworn declaration of the witness that he will tell the truth. Nor does the phrase "That puts me on the spot" help the suggestion. It is but a statement that the witness will be embarrassed or uncomfortable if called upon to testify.

So, in the instant case, the plea of surprise was bad, and should have been so declared by the court.

III. Cross-examination and Impeachment if the Plea is Sustained. Assuming that a witness made to counsel a prior oral statement contradictory of, or inconsistent with, the testimony of the witness up to the time of the plea,—the court upon sustaining the plea has a judicial discretion to allow counsel to cross-examine his own witness concerning the antecedent statement, and also to lay the foundation to impeach the witness, usually by proof of the prior statement.[3] But by a long line of cases such purpose is not to make affirmative evidence,

---

[3] It is interesting to note that the Judicial Council of New York in 1936 recommended to the Legislature that the Statute provide that one's own witness be contradicted by proof of a prior inconsistent statement *only* if made in writing and subscribed by him, or under oath. This recommendation was enacted into the Civil Practice Act, and into the Code of Criminal Procedure of New York. In its report the Council stated that "if prior inconsistent *oral* statements were admitted ...... it might afford too great a leeway in the impeachment of the witness. Evidence as to oral statements is too easily obtainable, and might well be used as a means of coercion. The admission of such testimony might completely nullify any gains that might be made in the modification of the rule. The guarantee against coercion is maintained by limiting prior inconsistent statements to those which are written or made under oath ......"

*but its sole purpose is to impeach the witness,* i. e. to induce the jury to disbelieve that which he testified to before the plea of surprise: *Commonwealth v. Turza,* 340 Pa. 128, 138, 16 A. 2d 401; *Commonwealth v. O'Donnell,* 81 Pa. Superior Ct. 89.[4]

Since the purpose of the cross-examination and impeachment is, then, to induce the jury to *disbelieve* the testimony of the witness,—there must be something in the witness' testimony, which, if not disbelieved by the jury will be hurtful or injurious to the party calling him. Were it otherwise there could be no occasion to discredit or impeach the witness or to stamp him as unworthy of belief. On the contrary it would be utterly immaterial whether the jury believed him or not. This is pointed out in *Fisher v. Hart,* 149 Pa. 232, 235, 24 A. 225. There the plaintiff called a witness who was asked whether the defendant superintended the construction of the scaffold. The witness answered, "I don't remember." He was then asked whether he had not so told counsel, to which he answered "I don't remember." The Supreme Court held "The witness had not testified to anything prejudicial to the plaintiff, nor does it appear that he had manifested any bias ...... The result of this (propounding leading questions by way of

---

[4] Counsel for the appellee and the court below thoroughly understood this. Appellee's brief states: "Where a party is permitted to impeach the credibility of his own witness by cross-examination or by the testimony of other witnesses it is, of course, necessary for the court to instruct the jury that the testimony on cross-examination and the testimony of such subsequent witnesses is not substantive evidence." The court below charged: "Obviously that (the alleged impeaching testimony of Detectives Grace and Hopkins) is not the way to prove that (suicide) threats were made (by Selden). It is hearsay evidence, utterly incompetent and not substantive evidence that any threats were made." And in its opinion refusing a new trial: "(They) had the right to take the stand and testify as to such conversations, not as substantive evidence of what was said but rather to impeach Berger's testimony."

cross-examination) was to put in the mouth of the witness the very allegations of fact which the plaintiff wished him to verify by an affirmative answer." In that case the witness though under cross-examination refused to give the answer desired. In *Gray v. Hartman,* 6 Pa. Superior Ct. 195, 198 this Court after referring to *Fisher v. Hart,* supra, stated: "...... the witness (there) testified to nothing prejudicial to the plaintiff (who called him) ...... His answers were 'I don't remember'. In this case, the witness Bachman, (called by the plaintiff, Gray) was important. His testimony was directly contradictory to that of the plaintiff; and ...... *the very opposite* of what he had stated in the preliminary examination, when the case was being prepared for trial." (Italics supplied). (In *Commonwealth v. Spardute,* 278 Pa. 37, 44, 122 A. 161, the testimony impeached "aided the cause" of the opposite party).

Therefore, if there is no testimony which needs to be neutralized, or which if accepted unchallenged will not aid the opposite party, or which was not hurtful to the side calling him, there is no excuse for cross-examination to impeach or discredit.

In the instant case it was, therefore, error to permit Detectives Grace and Hopkins to testify to that which was purely hearsay, viz. that Berger told them, that Selden had told Berger, that Selden was going to commit suicide. Berger having not given any testimony hurtful to the defendant, could not be thus impeached. It did place before the jury flagrant hearsay which was not and could not be evidence. That this detrimentally affected the plaintiff's case there can be no question. The trial judge recognized that danger and stated to the jury, "Now, I want to tell you that all of that testimony (the testimony of counsel for the defendant, of Detective Grace and of Detective Hopkins) so far as you are concerned, amounts to exactly nothing; and that you must try, *difficult as it is,* to

eradicate from your minds any idea, any thought, that there were actually any threats made by Mr. Selden to Mr. Berger that he was going to commit suicide ......" (Italics supplied). But the plaintiff was harmed. He had not called Berger as a witness, and was not concerned whether Berger was a good man and truthful, or an evil man and perfidious. This court cannot know what the real facts were but in the state of the evidence when Berger was called by defendant there might be grave doubts whether the jury would find on circumstantial evidence that Selden had committed suicide,— in the light of the testimony which showed the possible dangers of his occupation, the enmities that might exist against him, his normality, the many reasons he had to want to live, and the appointments for the very next day made by him with those whom he loved. Where the testimony is evenly balanced the jury may presume that the normal man wants to live: *Watkins v. Prudential Ins. Co.*, 315 Pa. 497, 173 A. 644.

IV. Cross-examination on the Ground of "Hostility." There is a variation of these rules, and it is pointed out here more to enumerate its possible dangers (to the party attempting to use it) than to pursue its ramifications. The rule was intimated in *Fisher v. Hart*, supra: "Without any further effort to *refresh his memory* than is indicated in the foregoing questions, the plaintiff was permitted to treat him as an adverse witness ......" (Italics supplied).

In Pennsylvania and other jurisdictions it is indicated that if the witness is hostile he can be cross-examined (as to an antecedent declaration) in order *to extract* the testimony counsel desires, by means of the blandishments or the severities of cross-examination.[5] But in this connection it is said, as in *Fisher v. Hart*,

---

[5] *State v. Riles* (Mo.), 204 S. W. 1; *Hickory v. U. S.*, 151 U. S. 303, 38 L. ed. 170, 14 S. Ct. 334; *People v. O'Gara* (Ill.), 110 N. E. 828.

supra, that the cross-examination of such a "hostile" or "reluctant" witness is to "refresh his recollection," by means of the prior inconsistent statement. If it stands on refreshing the recollection of the witness there are two attendant dangers. First, if the witness disdains the refreshment and doggedly continues to answer as he did before the plea of hostility, counsel calling and cross-examining him on the antecedent statement may find himself bound by the answers of the witness.[6] Secondly, such cross-examination may place before the jury such hearsay as to prejudice the opposite party, (as in the instant case) and require either the withdrawal of a juror or the granting of a new trial.

There is also a rule permitting impeachment by former inconsistent statement where a party is *compelled* to call a witness: *Morris v. Guffey,* 188 Pa. 534, 41 A. 731; *Sigfried v. Levan,* 6 S. & R. 308.

The following additional citations are illustrative:

"It is essential that it appear that the party has been actually surprised by the testimony of such witnesses, or that he has been deceived or entrapped into introducing the witness because of such contradictory statements ...... Since a party cannot, ordinarily, impeach his own witness on the ground of surprise unless the party show that he has actually been surprised by the testimony of his witness, it follows as a corollary that a party who introduces a witness will not be permitted to avail himself of a pretext of surprise in order to get before the jury contradictory statements of the witness when such statements are otherwise incompetent as evidence." "In analogy to the requirement that a party must be actually surprised by the testimony of his witness before he may be impeached on the ground of surprise, the mere fact that a witness has failed to testify as expected does not

---

[6] *Humble v. Shoemaker* (Iowa), 30 N. W. 492; *Largin v. State* (Ala.), 104 So. 556; *People v. Durrant* (Cal.), 48 Pac. 75.

warrant impeaching him by proof of prior statements in conformity to what he was expected to testify. Moreover the testimony which he has given must be affirmative and hostile or prejudicial to the party by whom the witness was called. Where the side calling the witness is on notice that he will not testify in accordance with statements made by him, he cannot, of course, be impeached by the side calling him on the ground of surprise." 70 C. J., Witnesses, Sections 1227, 1228, in part.

See also annotations, 74 A. L. R. 1042, 1064; 117 A. L. R. 326, which furnish many of the cases from other jurisdictions cited herein.

Appellee argues that under *Commonwealth v. Pinkenson,* 138 Pa. Superior Ct. 485, 11 A. 2d 176, one may cross-examine his own witness even though the antecedent testimony was not harmful, but the record in that case shows: (a). That the witness Biehling was asked whether he saw in the gambling establishment at the time of the raid any of defendants who were jointly indicted and tried with Pinkenson, and he replied "No". In the antecedent written statement he had replied "Yes". (b). No witness was called to impeach Biehling, (or the witness, Comb) nor were the antecedent written statements offered. (c). The trial judge stated to prosecuting counsel, "I understand your problem ...... but I know as a practical matter that cross-examining a witness on the plea of surprise *merely destroys his testimony.*" (d). Objection to any cross-examination tending toward impeachment was waived, defendant's counsel stating, "If it is his (Deputy Attorney General's) object to destroy the witness, go ahead."

In the instant case no motion to withdraw a juror was made by plaintiff when Detective Hopkins stated in answer to a direct question, that his report showed Hopkins' conclusion that Selden committed suicide. If such a motion had been made it scarcely would have been denied.

The assignments of error are somewhat in duplication and it will be sufficient to sustain the 5th, 6th, 9th, 10th, 11th, 12th and 13th.

Judgment of the court below is reversed with a venire.