**Rispo v. Motor Freight Express**

*John Mattioni* and *Dante Mattioni,* for plaintiff.

*John J. O'Brien, Jr.,* and *Frank C. Bender,* for defendants.

ANDERSON, *J.,* June 26, 1975—

## HISTORY

The above-captioned case, which was an action

in trespass brought by David Rispo (Rispo), a truck driver who sustained injuries from a falling crate of glass, was tried before this court and a jury. A compulsory nonsuit was entered for defendant, J. A. Cunningham Equipment, Inc. (Cunningham). On October 8, 1974, a verdict was rendered for plaintiff against Motor Freight Express, Inc. (Motor Freight) in the amount of $734,434.

Motor Freight filed motions for a new trial and for judgment n.o.v., which were dismissed on March 11, 1975, after a hearing, and judgment was entered for plaintiff. On March 26, 1975, Motor Freight filed a motion to rescind judgment and reinstate its original motion. The second motion was dismissed on April 9, 1975, after a hearing. An appeal was taken to Superior Court on April 9, 1975.

## FACTS

As we are required to do, the testimony will be discussed in the light most favorable to plaintiff, the verdict winner: Tolentino v. Bailey, 230 Pa. Superior Ct. 8, 326 A. 2d 920 (1974). On November 2, 1967, the day of the accident, Rispo, who was then 23 years of age, was employed as a truck driver by Marty's Express, a Philadelphia trucking firm. Rispo reported for work between 7 and 7:30 a.m. About an hour later, the dispatcher for Marty's Express, Victor Morano, told him there was no work for him there and that he was to report to Motor Freight. Rispo drove a Marty's Express tractor to Motor Freight, which was located at 1600 Warfield Avenue, arriving at approximately 9 a.m., at which time the Motor Freight dispatcher, George Middleton, advised him that the trailer from which he was to make deliveries was still in the process of being loaded, and that Rispo had time to get a cup of coffee. Rispo went to the drivers' room to wait. At

about 9:20 a.m., he received a call from Middleton, who told him that the trailer was ready. Rispo went down to loading bay number one and hooked his tractor to the waiting trailer. The door on the trailer was already closed, and Rispo had no opportunity to inspect the cargo. Rispo cheeked his first bill of lading, and about 10 a.m., left the Motor Freight terminal and proceeded to the first of six stops, Cunningham, located at 2025 Trenton Avenue, Philadelphia.

Rispo arrived at Cunningham at about 10:30 a.m., and was directed to pull into a side street. Rispo opened the trailer's rear door, and a Cunningham employe, Carl C. Pulliam, was sent with a fork lift truck to unload. The consignment to Cunningham consisted of three pallets or skids of welding rods, 3 by 5 feet each, and 2 to 3 feet high. The three skids were in a row, along the width of the trailer. Two of the skids were to the extreme rear of the truck, while the center one was somewhat recessed. On either side of the two outer skids of welding rods, leaning on edge against the insides of the trailer, was a carton containing sheets of glass. The cartons were 6 to 10 feet long, 5 to 6 feet high, and 4 to 7 inches thick. There was little room between the skids and the glass. A cable was attached to one of the side skids and it was pulled closer to the trailer door by the forklift. It was then removed by fork lift. The remaining two skids were removed in the same manner. There was no evidence that the forklift, cable or skids came in contact with the crates of glass during the unloading process.

When the unloading operation was finished, Rispo saw that the two crates of glass were not secured. A third crate of glass, located further in the truck, which was leaning against other cargo, was

also unsecured. It is undisputed that the Motor Freight employes charged with loading the truck did not secure the load because they were completing their shift and did not want to work into the next shift.

Rispo concluded that the cartons had to be braced or chocked before he attempted to drive the truck to his next stop. He went to the Cunningham premises, where he obtained wood, nails and a hammer. Rispo jumped into the trailer, laid the bracing materials on the truck bed and walked to the front, where he examined the third crate of glass. As he was walking back towards the open rear, the crate of glass to Rispo's right started to fall. Rispo tried to jump clear, but the crate fell, crushing his left leg.

Rispo was taken to St. Mary's Hospital in a semiconscious state. Dr. Jose H. Auday was called to attend him. Auday diagnosed Rispo's injury as a comminuted fracture of the femur (a crush-type injury) plus soft tissue injury to the thigh and leg. In addition to the major break, there were several bone fragments which were displaced.

On November 7, 1967, after ascertaining that Rispo's physical condition was satisfactory enough to permit surgery, Dr. Auday inserted a pin, or intramedullary rod, 12 to 14 millimeters in diameter and 42 centimeters in length, through the femur from hip to knee. Rispo was placed in traction, and on November 16, 1967, he was placed in a spica cast, which extended from the lower chest to the ankle joint. Rispo was discharged from the hospital on November 22, 1967, but the cast was not removed until January 2, 1968. By May 16, 1968, Rispo was complaining of pain, and Dr. Auday found that a bursitis had developed in the left trochanteric area. On September 24, 1968, Rispo

was again admitted to St. Mary's. X-rays indicated that the fracture was healing, so Dr. Auday incised an area above Rispo's left hip and pulled out the pin. Dr. Auday continued to see Rispo periodically during 1968.

In January, 1969, Dr. Auday told Rispo he could do light work if it did not require much walking or climbing. Rispo returned to Marty's Express and worked on the loading dock for several months. On October 20, 1969, Rispo was complaining of pain over the left, lower leg and there was a marked valgus deformity of the same area. Flexion was limited. X-rays showed a nonunion of the bone fragments.

On February 11, 1970, Rispo was admitted to Albert Einstein Medical Center, Southern Division. Dr. Auday performed a bone graft, utilizing bone from the thigh area, and inserted a compression plate over the femur, which was about 6 to 8 inches long, in order to immobilize the fracture and prevent further deformity. Rispo was released on March 3, 1970, on crutches and without a cast, with instructions not to put weight on the leg. When Dr. Auday saw Rispo on March 26, 1970, he was doing well.

Sometime between then and April 27, 1970, when Rispo next saw Dr. Auday, Rispo's young son became ill, and Rispo carried the 12-pound child down a flight of stairs, and later went to the hospital. For about three hours he was without his crutches, and during that period placed weight on the leg. He experienced no pain. However, X-rays taken in April, 1970, show that the compression plate had slipped a little, although there was no movement of the bone.

On May 28, 1970, in order to afford better protec-

tion, a plaster cast was applied from groin to the foot. The cast permitted lifting of the leg, but no rotation or lateral motion.

Rispo continued to see Dr. Auday. On September 22, 1970, when Rispo came for an examination, he was without the cast. It had come loose and he had removed it. He was advised to stay on crutches without the cast.

By November 23, 1970, X-rays showed that the compression plate was somewhat loose and by March 23, 1971, one of the screws holding it in place had broken. The fracture did not appear to be healed and movement of the bone was occurring. Rispo was rehospitalized. Dr. Auday removed the plate and the screws, and with the bone exposed, found that there had been no union of the bone fragments. Rispo was again placed in a spica cast.

Rispo was admitted to West Park Hospital and on June 1, 1971, Dr. Auday performed a second bone graft, utilizing bone from Rispo's left pelvis. Rispo was in the intensive care unit for 48 hours after surgery. He was then placed in skeletal traction: a pin was inserted through the tibia, and weights were attached to hold the leg in place.

On July 9, 1971, the pin was removed and a spica cast applied. On July 15, 1971, Rispo was discharged with the cast and on crutches. He remained in a cast until December 14, 1971, at which time he was fitted with an ischial weight-bearing brace, which he continued to wear until September 1972.

When Dr. Auday last examined Rispo in September 1974, no union of the bones had occurred. There was a 5-inch shortening of the left leg and Rispo walked with a marked limp. There was restricted bending of the knee. He had developed a

curvature of the lumbar spine, caused by tilting of the pelvis. Rispo showed signs of anxiety and was referred to a psychiatrist.

Dr. Auday testified that in the future, Rispo will develop arthritis of the knee, hip and back, and that, as his leg muscles weaken with age, he will require a brace or another bone graft. Amputation is a possibility.

## SUFFICIENCY OF THE EVIDENCE

Evaluating the evidence set forth above, defendant's motion for judgment n.o.v. was properly denied. Rispo was assigned to make deliveries from a truck in which glass crates were loaded by the defendant's employes, unbraced, and was injured as a result thereof. Whether the manner in which the truck was loaded constituted negligence was an issue for the jury under proper instructions. See Mokrzycki v. Olson Rug Co., 170 N.E. 2d 635 (Ill. App., 1960). Similarly, although defendant presented evidence that Rispo looked into the trailer and was told that the glass crates were unbraced, such evidence of contributory negligence was contradicted by plaintiff, and it was for the jury to reconcile the conflicting testimony. See Perry v. First Corporation, 334 P. 2d 299 (Cal. Ct. App., 1959). The jury's verdict is amply supported by the law and the evidence.

Turning now to defendant's specific objections, the court will address itself only to those which were briefed.

## CROSS EXAMINATION BASED ON A PLEA OF SURPRISE

Defendant called as a witness Hugh O'Neill. Mr. O'Neill was a truck driver with 30 years of experi-

ence and resided just across the street from Cunningham's. On the day of the accident, he observed the unloading of the skids of welding rods, saw the crate of glass fall and attempted to aid Rispo. After Mr. O'Neill had briefly recounted to the court and the jury what he had observed, counsel for defendant attempted to examine him with reference to a signed statement he had given previously. Upon objection, Mr. O'Brien indicated that the witness had omitted certain facts from his narrative. The court sustained plaintiff's objection, and advised counsel to interrogate the witness concerning the omitted facts. Thereafter, in answer to Mr. O'Brien's questions, Mr. O'Neill testified that he saw Rispo get materials which he assumed would be used for chocking, and that, prior to this, the crates did not appear to be chocked. This testimony appeared to Mr. O'Brien to contradict an earlier signed statement indicating the presence of chocking material, which fact was the basis for a defense theory that Rispo himself had improperly chocked the crates before leaving the Motor Freight terminal.

Mr. O'Brien did not then plead surprise and ask to cross-examine his witness. Instead, he continued his direct examination and elicited opinions based on the witness's expertise as a truck driver. Mr. O'Neill testified that he would have chocked the crates; that they could not have been chocked while the welding rods were in the trailer; and that under these circumstances, he would have still removed the welding rods because it was a delivery. After eliciting the foregoing potentially damaging testimony, Mr. O'Brien attempted to requestion Mr. O'Neill about the presence of chocking, and then pled surprise and expressed a desire to cross-

examine his witness. The court denied counsel's request.

The law of Pennsylvania concerning a plea of surprise is set forth in the case of Selden v. Metropolitan Life Insurance Co., 157 Pa. Superior Ct. 500, 43 A. 2d 571 (1945). When one's own witness tells a story in court that is different than a prior one, then, under certain circumstances, the attorney may plead surprise and ask leave to cross-examine his own witness and impeach him by use of his prior contradictory statement.

The plea, or suggestion of surprise, which is in the nature of an offer of proof, should be made as soon as counsel is surprised and should set forth the facts upon which the plea is based. The facts must show that: (1) counsel was not merely disappointed by the testimony, but was actually "taken unaware;" (2) the prior statement had been made in the presence of the party calling the witness or in counsel's presence, or is in writing, subscribed or under oath; (3) the antecedent statement must contradict or be inconsistent with the testimony of the witness prior to the plea of surprise: 157 Pa. Superior Ct., at pages 505-06. If the above conditions are met, cross-examination may be permitted if there is something in the witness's testimony which, if not disbelieved by the jury, will be harmful to the party calling him. Id., at page 508.

In the instant case, when Mr. O'Brien first pled surprise, Mr. O'Neill's testimony had been in no way contradictory to his prior statement, because he had merely omitted a detail from his brief, one-page narrative. The circumstances are akin to a situation where a witness testifies at trial that he cannot remember certain facts or he had failed to observe a specific incident. In such case, while the

witness's testimony may be disappointing, it neither helps nor harms the calling party and, therefore, does not afford a basis for cross-examination. See Goodis v. Gimbel Brothers, 420 Pa. 439, 218 A. 2d 574 (1966).

Because Mr. O'Neill's testimony was, at that point, neither contradictory nor damaging, the plea of surprise was properly dismissed.

Thereafter, Mr. O'Brien specifically elicited answers from Mr. O'Neill to the effect that the crates of glass had been unchocked. That testimony was, in Mr. O'Brien's opinion, contradictory to Mr. O'Neill's previous statement, and it was harmful to Motor Freight's case because it negated the possibility that Rispo himself had braced the crates in an improper manner at the Motor Freight terminal. At that point, a suggestion of surprise could have been properly set forth by Mr. O'Brien. Instead, however, counsel continued to examine Mr. O'Neill and, in fact, questioned him as an expert witness. Not until Mr. O'Neill had given opinions, solicited by Mr. O'Brien, which were of a damaging nature, did Mr. O'Brien attempt to re-assert his plea of surprise and request permission to cross-examine his witness about his prior statement. That statement was hearsay and was inadmissible at trial as substantive evidence. The sole purpose for cross-examination of Mr. O'Neill about the statement would have been to induce the jury to disbelieve that which he had testified to before the plea of surprise: Selden v. Metropolitan Life Insurance Co., 157 Pa. Superior Ct. 500, 508, 43 A. 2d 571 (1945).

Because counsel did not plead surprise promptly, but instead questioned Mr. O'Neill as to his opinions as an expert, any attempt to impeach Mr.

O'Neill's credibility on the issue of chocking would have resulted in the discrediting of his expert opinions as well, even though those opinions were given after his arguably impeachable testimony. Inasmuch as Mr. O'Brien obviously considered Mr. O'Neill a credible expert witness, it would have been inconsistent to allow counsel to argue that Mr. O'Neill was not a credible fact witness. For the above reasons, Mr. O'Brien's second plea of surprise and request to cross-examine his witness were denied.

## QUALIFICATIONS OF EXPERT WITNESS

Defendant contends that the court erred when it permitted John A. DePew to testify as an expert witness about tractor-trailers, the various methods of securing loads and personnel responsibility with respect to securing loads.

The law of Pennsylvania concerning expert witnesses is set forth in Moodie v. Westinghouse Electric Corp., 367 Pa. 493, 80 A. 2d 734 (1951): "If a witness 'has any reasonable pretension to specialized knowledge on the subject under investigation he may testify, and the weight to be given his evidence is for the jury. . . .' " See also Lineoski v. Susquehanna Coal Co., 157 Pa. 153, 159, 27 Atl. 577 (1893). Moreover, the standard of qualification must not be set so high as to exclude the only available kind of testimony ordinarily obtainable in such cases: White v. Western Allegheny R.R. Co., 222 Pa. 534, 71 Atl. 1081 (1909). Practical experience may suffice to qualify a witness as an expert, in a proper case: Abbott v. Steel City Piping Co., 437 Pa. 412, 263 A. 2d 881 (1970). It is a matter of discretion with the trial judge, whether the qualifications of a witness justify the admission of his testimony

as that of an expert. However, where the trial judge commits clear error, that error will be grounds for reversal on appeal: Taylor v. Spencer Hospital, 222 Pa. Superior Ct. 17, 292 A. 2d 449 (1972).

Mr. DePew is a safety engineer who has been involved in the trucking industry for 26 years. For 21 years, he was employed by Dohrn Transfer Company, and from 1954 to 1969 was director of safety for Dohrn. Currently, he acts as a safety consultant and spends most of his time conducting audits for various firms, which involves preparing job descriptions and evaluations of drivers' qualifications. While he was with Dohrn, he came into contact with 25 different truck terminals and was familiar with the duties and responsibilities of truck drivers, dock-men, and loading and unloading personnel. He had personally observed many hours of loading and unloading, including proper stowage procedures. While with Dohrn, he devoted about ten percent of his time to the area of safety in the loading and unloading of trailers. Currently, he is responsible for training dock foremen in safety procedures.

Contrary to defendant's contention that Mr. DePew " 'had a very meager experience along the lines of the subject on which he sought to qualify as an expert' " (Potter v. Glosser Bros. Department Store, Inc., 146 Pa. Superior Ct. 129, 132-33, 22 A. 2d 28 (1941)), this court considers the knowledge gained by Mr. DePew over a period of 26 years, more than adequate to qualify him as an expert in the field of loading and unloading trucks. The fact that his broad experience may have made him more qualified in other aspects of trucking safety does not diminish his expertise in the area at issue. The argument that Mr. DePew was unqualified as an

expert because he had not been actively involved for five years in the aspect of trucking safety for which he sought to qualify as an expert is irrelevant, since there was no argument made that methods or materials used in loading, unloading or securing truck cargoes had changed in the interval.

Accordingly, the court did not abuse its discretion in permitting Mr. DePew to testify as an expert witness. The weight to be given to his testimony was for the jury: Taylor v. Spencer Hospital, supra.

## RECROSS-EXAMINATION

Defendant contends that the court was in error when it sustained an objection to the following question:

"Mr. Rispo, could you, based on your experience in loading and unloading, could you have nailed a piece of wood from the top of one crate of glass to the top of the other crate of glass before you pulled out the skids, so that the crates of glass would not fall?"

That question was asked of Rispo on recross-examination, following cross-examination by Frank Bender, Esq., on behalf of defendant, Cunningham, and redirect by plaintiff. Mr. O'Brien was advised and indicated that he understood that his cross-examination would be limited to clarification of testimony elicited on cross-examination by Mr. Bender and during plaintiff's redirect.

All of the questions asked by plaintiff's counsel on redirect were objected to, successfully, by Mr. O'Brien. The purpose of the examination by Mr. Bender was to show that Cunningham did not cause or contribute to the happening of the accident by any act or omission of its employes. The question at issue, which related to cross-bracing, was be-

yond the scope of Mr. Bender's cross-examination.

While it is true that when a party to an action offers himself as a witness, he may be cross-examined freely as to any matter relevant and material to the issues, even if such examination exceeds the scope of direct examination (McKean v. J. S. Kresge Co., 195 Pa. Superior Ct. 236, 171 A. 2d 582 (1961)), nevertheless, considerable latitude is left to the trial judge (Tolemeo v. Harmony Short Line Motor Transportation Co., 349 Pa. 420, 37 A. 2d 511 (1944)), and recross-examination may properly be limited to the scope of the redirect examination or, as in this case, limited to the scope of cross-examination by defendant, Cunningham. See Commonwealth v. Romano, 392 Pa. 632, 141 A. 2d 597 (1958). In that case, our Supreme Court said:

"Defendant next attacks the court's refusal to permit further cross-examination of one of the police officers who had testified as to the bloodstained bill and bloodstained clothing of defendant. The officer had undergone direct examination and cross-examination. He was then called on redirect examination, and, in a discussion with the court, defendant declared that he would limit his recross-examination to the points raised on redirect. However, he proceeded further to cross-examine the officer and was prevented from so doing by the court. A reading of the record abundantly discloses that defendant had been given free rein in cross-examination, not having been hindered in any fashion by the court. Cross-examination is a matter of right, but the bounds of proper cross-examination are necessarily within the sound discretion of the trial judge, and this is

particularly so when applied to recross-examination. It must be clear that counsel cannot be permitted to prolong the course of trial by continually returning to matters already considered or as to which he has been given ample opportunity to examine; otherwise, there would be no orderly procedure, and nothing but confusion." 392 Pa., at pages 637-38.

In the instant case, Mr. O'Brien had also been given "free rein in cross-examination," which covered 75 pages of trial transcript. It was not an abuse of discretion for the court to refuse to permit questions on recross-examination which related to an issue which had not been previously raised, directly or by inference, in Mr. Bender's cross-examination.

## PRESENT WORTH

Defendant argues that the jury should not have been charged that the cost of future medical expenses should not be reduced to present worth, citing Hoffman v. Sterling Drug, Inc., 485 F. 2d 132 (3d Cir., 1973), and Frankel v. United States, 321 F. Supp. 1331 (E.D. Pa., 1970).

The charge of the court was plainly in accordance with Pennsylvania law. See Yost v. West Penn Railways Co., 336 Pa. 407, 9 A. 2d 368 (1939). Moreover, future medical expenses were not an issue in Hoffman, and, therefore, reliance on that case is misplaced. In Frankel, the Federal court acknowledged that Yost expresses the sound general rule that future medical expenses should not be reduced to present worth. The court distinguished the case before it as presenting exceptional circumstances. Plaintiff was permanently and totally

disabled, requiring institutional care for the remainder of her life. The costs of institutionalization would recur periodically in the same manner as future earnings are payable periodically. The court concluded that if such costs, totaling $821,250, were not reduced to present worth, plaintiff would reap a windfall.

There are no equivalent exceptional circumstances presented in the instant case to support a departure from what is clearly the law of Pennsylvania.

## IMPAIRMENT OF EARNING CAPACITY

Defendant contends that there was insufficient evidence to submit the issue of impairment of earning capacity to the jury.

The test of impairment of earning capacity is whether or not there is a loss of earning power, and the ability to earn money as a result of injury: Mazi v. McAnlis, 365 Pa. 114, 74 A. 2d 108 (1950). Loss of earning power and its amount must appear by proper and satisfactory proof, and must not be left to conjecture: Zimmerman v. Weinroth, 272 Pa. 537, 116 Atl. 510 (1922).

In the instant case, plaintiff has experienced severe and permanent injuries. The evidence is that Rispo suffered a comminuted fracture of the left femur, which has never united. As a result, he has a five-inch shortening and marked deformity of the left leg, a severe limp and a curvature of the spine due to a pelvic tilt. His condition will worsen with time, and amputation of the leg is a possibility. Rispo experiences pain when walking, and when standing or sitting for long periods of time. The evidence is more than sufficient to support a finding that Rispo is permanently disabled from driving

a truck or doing all work involving substantial physical activity. He has no training in, or aptitude for sedentary work, and has developed psychiatric problems which presently render him emotionally unfit to engage in such work.

Defendant specifically objects to portions of the testimony of Andrew G. Verzilli, an associate professor of economics at Drexel University. Dr. Verzilli calculated Rispo's loss of future earnings on the basis of several assumptions: (1) that Rispo would have worked 40 hours regular time and five hours overtime each week; (2) that the wages would be governed by the current contract with Local 107, which runs until June 30, 1976, and that his wages would increase at the rate of 4.19 percent thereafter, over his work expectancy; (3) that Rispo, in his injured state can earn approximately $5,000 per year[1] (which amount would also increase by 4.19 percent per year); (4) that Rispo's work expectancy would have been 35 years; (5) and that the entire amount must be reduced to present worth at the rate of six percent simple interest.

Defendant challenges the first two assumptions as conjecture. We do not agree. Rispo testified that he began driving a truck in 1965, when he completed his military service, and joined Teamsters Local 107 at that time. He worked for Kohl Brenner Steel and out of the union hiring hall. In 1965, he earned $840 and in 1966, $5,100. In July 1967, he began his employment with Marty's Express, and worked steadily until November 2, 1967, the day of

---

1. Dr. Saul Leschner, a vocational expert who has special skills in the training, rehabilitation, and placement of handicapped persons, testified that if Rispo is able to overcome his psychological problems, he might be able to find employment and earn $4,500 to $5,000 per year.

the accident, earning $6,631. Based on the evidence of wage rates at that time for truck drivers who were members of Local 107, such an amount would indicate that Rispo worked full 40-hour weeks and approximately one hour per week overtime, at time-and-a-half.

Michael Clark, a truck driver who is a union steward, testified that truck drivers who work out of the union hiring hall get approximately one hour of overtime work a day, while drivers who work for specific companies as city drivers can work four to 15 hours of overtime each week; the higher the seniority, the more overtime a driver gets. The evidence in the record was, therefore, sufficient to indicate what the salary of a truck driver in the Philadelphia area would be, including overtime.

Whether Rispo would have continued in his employment as a truck driver if he had not been injured was a question for the jury. The evidence was that Rispo had a high school education, that he had worked on trucks before entering military service, that he had started driving a truck after his discharge, and that he had never considered engaging in any other type of work. The evidence also shows that he returned to Marty's Express in 1969, as soon as he was able to put weight on his injured leg, and worked on the loading dock doing light work for several months. From those facts, the jury could have concluded, and Dr. Verzilli was justified in assuming, that Rispo would have continued to work as a truck driver during his working life, and that he would have worked 40 hours a week, plus overtime, which would have increased over the years as he gained in seniority. It was for the jury to assess the relevance of Mr. Clark's testimony that at the time of trial in October 1974, the trucking

industry was in a depressed state generally and that there had been lay-offs of employes.

Defendant also contends that it was improper for Dr. Verzilli to testify that wages would increase at the rate of 4.19 percent per year, which figure represents the historic rate of growth in the private nonagricultural sector of the United States economy. Defendant incorrectly asserts that Dr. Verzilli did not indicate to what period of history he was referring. Dr. Verzilli specifically testified that the 4.19 percent factor represented the average annual growth in wages since 1947. That the 4.19 percent figure is at variance with plaintiff's evidence of the actual rate of wage increase for Philadelphia truck drivers in no way disadvantaged defendant, since the hourly rates for Local 107 drivers increased from $2.90 in 1963 to $6.96 in 1975, or approximately 11 percent per year.

Defendant has cited two cases decided by the United States Court of Appeals for the Third Circuit, which held that an earnings increase factor which is based solely on concepts of inflation and the declining value of the dollar is speculative and should not be submitted to the jury: Hoffman v. Sterling Drug, Inc., 485 F. 2d 132 (3d Cir., 1973); Magill v. Westinghouse Electric Corp., 464 F. 2d 294 (3d Cir., 1972).

Defendant has cited no decision from Pennsylvania courts holding similarly. While we agree that there is a certain element of speculation involved in forecasting future wage fluctuation, that is also true of many other elements involved in the determination of future loss. Such elements as life expectancy, work expectancy, employability and health habits are equally elusive concepts, but are routinely submitted to the jury for consideration. Furthermore, it is required that the jury be charged

that any award for impairment of earning capacity must be reduced to present worth by a factor of six percent simple interest per year. Yet, it is common knowledge that the rate of return on investments fluctuates from year to year. The assumption that a six percent return will be forthcoming over an individual's work expectancy is no less speculative than an assumption that wages will continue to increase in the future at the same rate as they have in the past.

Moreover, the testimony in the instant case was far less speculative than that presented in the two Federal cases cited by defendant. In Magill v. Westinghouse Electric Corp., supra, an actuary who had no expertise as an economist used an inflation rate of three and one-half percent in arriving at future loss of earning capacity. He testified that that factor was the average of the figures (three percent and four percent) used by accounting firms he knew of, when calculating the sum necessary to fund a pension plan. There was no further evidence to show that the three and one-half percent factor was determined by other than mere guess and speculation. In Hoffman v. Sterling Drug, Inc., supra, an economist assumed a six percent growth factor for 26.3 years of work expectancy of an architectural draftsman, based solely on the fact that his earnings had increased over a five-year period at the rate of six percent per year.

In the case at bar, the 4.19 percent earnings increase factor testified to by Dr. Verzilli was based on economic growth spanning a period of 27 years, which was over five times longer than the relevant period in Hoffman. Unlike the factor testified to in Magill, the 4.19 percent figure represents actual growth in wages.

Furthermore, Rispo, when he was employed, re-

ceived wages in accordance with contracts with Teamsters Local 107. Under those contracts, truck drivers in the Philadelphia area have received yearly wage increases since 1963, that far exceed the 4.19 percent national average. That fact provides additional support for the assumption that Rispo's wages would continue to increase in the future at a rate of at least 4.19 percent.

Assuming arguendo, that the holdings in Hoffman and Magill are correct and that the testimony was improper, defendant still is not entitled to a new trial because he failed to raise the issue in a timely fashion. Mr. O'Brien did not object to Dr. Verzilli's testimony concerning future salary increases, or to the use of the 4.19 percent earnings increase factor, nor did he move to strike the testimony. The court did not charge the jury on the earnings increase factor, and defendant did not submit a point for charge on the issue. Defendant's failure to object to the testimony until it filed its motion for a new trial effects a waiver of the objection: Weaver v. Ford Motor Co., 382 F. Supp. 1068 (E.D. Pa., 1974); See Dilliplaine v. Lehigh Valley Trust Co., 457 Pa. 255,322 A. 2d 114 (1974).[2]

---

2. The Civil Instructions Subcommittee of the Pennsylvania Supreme Court Committee for Proposed Standard Jury Instructions has suggested a jury charge on wage fluctuations which includes the concept of future wage trends in its Draft of October 14, 1973:

"6.22 (Civ.) DAMAGES—EARNINGS FLUCTUATIONS

"If you find that the plaintiff will suffer an impairment or loss of earning power as the result of this accident [In death cases: in determining the amount which the decedent would have earned had he not died as a result of this accident], you may take into consideration possible fluctuations with respect to such losses. In other words, if you find that the plaintiff's (or decedent's) wages would have increased or decreased over the

## MOTION TO REINSTATE MOTION FOR NEW TRIAL

**Defendant filed a motion to reinstate its motion for a new trial pursuant to the Act of June 1, 1959,**

years, you will take that factor into consideration so that proper compensation can be made. [You have heard evidence of wage changes in the past with respect to the plaintiff's employment, together with evidence concerning future wage trends, which you may consider in your deliberations; however, such evidence is not conclusive, and is offered to you only as a guide.]

### "Subcommittee Note

"In nearly every case where several years elapse before the trial of a case involving a permanently disabled plaintiff, there is evidence of some wage fluctuation in the plaintiff's position, and additional evidence of wage fluctuation prior to injury may be introduced. Even without such evidence, the jury should consider future wage trends in order to arrive at a verdict consistent with the plaintiff's actual loss of earning power.

"Such a charge has sometimes been refused on the ground that it is speculative or remote. However, it should be noted that all factors making up a determination of future loss are, by their very nature, 'speculative.' Such elusive factors as life expectancy, work-life expectancy, employability, health and habits are routinely given to the jury for their factual determination; we can see no reason why the jury should not be given the entire picture. Indeed, wage fluctuations have been considered in death cases for nearly half a century: McCaffrey v. Schwartz, 285 Pa. 561, 571-72, 132 A. 810 (1926), cited with approval; Murray v. Philadelphia Trans. Co., 359 Pa. 69, 74, n.6, 58 A. 2d 323 (1948); see, e.g., Carminati v. Philadelphia Trans. Co., 405 Pa. 500, 176 A. 2d 440, 444 (1962); Spangler v. Helm's New York-Pittsburgh Motor Express, 396 Pa. 482, 488, 152 A. 2d 484 (1959).

"In Magill v. Westinghouse Elec. Corp., 464 F. 2d 294, 299-301 (3rd Cir. 1972), the Third Circuit recognized that 'earning power' should include a factor for earning increases, if proper evidence could be introduced. We believe that this 'federal' rule is unduly restrictive; even in the absence of economic evidence, the jury should not be foreclosed from examining the entire wage picture that goes into the ultimate determination of lost earning power."

P.L. 342, (No. 70), sec. 1, 12 P.S. §1032, alleging that new evidence had been discovered.

The law of Pennsylvania relative to after-discovered evidence is clear. After-discovered evidence may require the granting of a new trial if the evidence is new, if it could not have been obtained at trial by the exercise of reasonable diligence, if it is relevant and not merely cumulative, if it is not for purposes of impeaching credibility, and if it is such as would result in a different verdict if a new trial were granted: Hydro-Flex, Inc. v. Alter Bolt Company, Inc., 223 Pa. Superior Ct. 228, 296 A. 2d 874 (1972). See also Hagopian v. Eskandarian, 396 Pa. 401, 153 A. 2d 897 (1959); Stewart v. Leiper, 142 Pa. Superior Ct. 429, 16 A. 2d 660 (1940). In addition, a new trial should be granted when it appears by "incontrovertible" evidence obtained after trial that the verdict was rendered by reason of the perjury of the litigant in whose favor it was entered: Candelore v. Glauser, 291 Pa. 582, 140 Atl. 525 (1928).

The new evidence set forth by defendant in its petition relates to the type of doors with which the trailer in which Rispo was injured was equipped. During the trial, plaintiff presented evidence that the door was of a roll-up, or garage-door type, and that it was closed when Rispo first saw the trailer. On the other hand, defendant's witnesses testified that the trailer had barn-type doors that could not be closed while the trailer was pulled up to the loading dock, and that Rispo was told and actually saw that the crates were unbraced.

On March 13, 1975, subsequent to the entry of judgment, counsel for defendant received, in connection with a case in Federal District Court, a copy of a lease agreement which allegedly shows that

the trailer in which plaintiff was injured was leased to Marty's Express by Transport Pool, Inc. Counsel also received a copy of an inspection report which, it is argued, indicates that the trailer had barn-type doors.

This evidence does not meet all the criteria set forth in Hydro-Flex, Inc. v. Alter Bolt Company, supra. First, it is inaccurate that there was "never even an indication by any party or witness in this case that the trailer in question was owned by any person or entity other than Marty's Express." David Rispo, under cross-examination by Mr. O'Brien, testified that the trailer in question was a "transport pool" trailer. Michael Clark testified that Marty's Express had trailers that were rented from the "transport pool." Diligent investigation would have revealed the relationship between Marty's Express and Transport Pool, Inc.

Even more important, however, is the fact that the additional evidence was merely cumulative. The type of doors on the trailer was a much-contested issue. David Rispo, Michael Clark and Joseph W. Lawrence testified that the doors were of the roll-up type. On behalf of defendant, Walter Repsch and Carl C. Pulliam testified that they were barn-type doors, and James Carr testified that the trailer could not have been closed while it was pulled up to the loading dock.

The copy of the inspection report that was presented to this court in defendant's petition is a printed form on which, among other things, the make (Strick), serial number (77589) and type of trailer (single axle, "28' Cty. Del.") had been typed in. The remainder of the report is divided into two sections: the "out" section deals with initial receipt and inspection, while the "in" section deals with

return receipt and inspection. Among other items included in each section is a set of six printed, outline drawings showing the parts of a trailer: left side, top, right side, floor, front, rear. The drawing of the rear door measures approximately one inch in height and seven-eighths-inch in width. Approximately three-sixteenths of an inch from the top is a horizontal line. A vertical line bisects the drawing from the horizontal line to the bottom. In the first set of drawings, the typed letters "OK" appear on each of the six trailer parts. On the drawing of the door, the "O" is to the left, and the "K" is to the right of the vertical line. The second set of drawings are the same as the first, except that hand-written check marks appear on the drawings instead of the letters "OK" and on the drawing of the door, there is one check mark to the left and another check mark to the right of the vertical line. The two sections of the inspection report are signed by different persons.

The new evidence proffered by defendant is vague and unconvincing. Defendant presented no evidence that the trailer referred to in the report was the same trailer as that on which plaintiff was injured. The vertical line on the drawing which arguably indicates the presence of barn-type doors was pre-printed, and there was no evidence that a different inspection form was ever used for trailers with roll-up doors. Therefore, the only relevant evidence in the report is the fact that notations were placed on both sides of the drawing of the back door, to the right and to the left of the vertical line. However, a visual examination of both the "out" and "in" sections of the report indicates that the writing instruments used to make the notations on the drawings were different than the ones used to sign the report. It is, therefore, impossible to even as-

sume that only one person prepared each section, or that the notations were made by the persons who actually made the inspections.

It is the opinion of this court that the new evidence was of no greater value than the trial testimony of each of the five witnesses who observed the trailer, and that it certainly does not represent "incontrovertible" evidence of perjury by Rispo: Candelore v. Glauser, supra.

At the hearing, Mr. O'Brien did not indicate that further inquiry was then being made, either of Transport Pool, Inc. or Strick Trailers, or any other entity which could supplement the information set forth in the lease agreement and inspection report.

Because the proffered evidence was merely cumulative, and was vague and unconvincing, and because there was no indication that the necessary incontrovertible evidence would be forthcoming within a reasonable time, defendant's motion to reinstate its motion for a new trial was dismissed.