556 A.2d 892

**John GAUL & Evelyn Gaul, Administrators of the Estate of Richard Gaul, Deceased, and John Gaul & Evelyn Gaul, h/w, in their Own Right, Appellants,**

v.

**CONSOLIDATED RAIL CORPORATION.**

Superior Court of Pennsylvania.

Argued Jan. 20, 1989.

Filed April 4, 1989.

Stephen H. Skale, Philadelphia, for appellants.

D. Donald Jamieson, Philadelphia, for appellee.

Before CIRILLO, President Judge, and BECK and TAMILIA, JJ.

CIRILLO, President Judge:

This is an appeal from an order of the Court of Common Pleas of Philadelphia County denying the removal of a compulsory nonsuit and entering judgment in favor of the appellee Consolidated Rail Corporation [Conrail]. We affirm.

This case arises out of the death of plaintiffs/appellants John and Evelyn Gaul's son, Richard Gaul, on the evening of November 26, 1980. Richard was run over and killed by a train travelling westward from Philadelphia to Reading on Conrail's Norristown line. From testimony adduced at trial, it appears that at the time of the accident, Richard was lying motionless in the center of the track, with his head pointing to the east and his feet to the west, with his arms at his side, and his legs together. It was dark at the time of the accident, and Richard was not at a regular railroad crossing when he was struck. The Gauls brought suit against Conrail, alleging that it knew or should have known of Richard's presence in a place of imminent danger or peril, and that it willfully, wantonly, recklessly, and negligently failed to halt the train before it ran over him. Although they did not plead the doctrine of permissive crossing in their complaint, they were permitted to do so at trial.

The Gauls called as on cross-examination John Dillon, the operator of the train which hit Richard.[1] He testified that he saw what appeared to be a "stub tie" on the tracks approximately fifty to seventy-five feet ahead of the train, and began to slow the train. When he was thirty feet from the object, and travelling at a speed of approximately thirty miles per hour, he realized that the object was a person lying on his or her back. He then put the brake into the emergency position. The train came to a stop roughly one hundred to one hundred and fifty feet after the emergency brake was put on. Dillon also testified that there was a pathway, worn with use, on one side of the tracks in the area where Richard was lying, which he had seen in use "a couple times a week" over the six years in which he had been working that particular route for Conrail.

At the close of the Gauls' case on liability, Conrail moved for a nonsuit, and its motion was granted by the court. The court found that the evidence produced was insufficient to show that a permissive crossing existed, and, further, even if the evidence had been sufficient, Richard was not using the crossing in a permissible manner, rather, he was lying on the tracks. Therefore, he was not entitled to the duty of care owed to persons using permissive crossings. The Gauls made a timely motion for removal of the nonsuit, which was denied. The Gauls then appealed to this court.

1. In its brief, Conrail states that because Dillon was not an adverse party, he could not be called as on cross-examination. This is clearly not the case. A witness may be called as on cross-examination when his interest is adverse to the party calling upon him or her to testify. *See* 42 Pa.C.S. § 5935. The supreme court of this Commonwealth has interpreted this to mean that the interest of the witness called as on cross-examination must be involved in the suit in the sense that the judgment in the case would operate on the witness' legal rights and liabilities, and that the interest in question would be promoted by the success of the adversary to the party calling the witness. *Dinger v. Friedman,* 279 Pa. 8, 13–14, 123 A. 641, 642–43 (1924); *see also* 9 Standard Pennsylvania Practice 2d § 54:93 (1982). The trial court made a determination that the witness, Dillon, was properly called as on cross-examination. Such a determination was a factual one within the court's discretion. *Dinger,* 279 Pa. at 14, 123 A. at 643.

On appeal, the Gauls argue that the evidence of permissive use of Conrail's railroad tracks was sufficient to present a jury question as to the existence of a permissive crossing. Secondly, they argue that the trial court erred in finding that because Richard was lying on the tracks rather than actively walking across them he was not owed the duty of care given a person in a permissive crossing. Lastly, they contend that even if the evidence presented at trial was insufficient to prove a permissive crossing, the court should have permitted the question of wanton or willful misconduct to go to the jury.

When considering an appeal from a trial court's refusal to remove a compulsory nonsuit, the appellate court reviews the record in order to determine whether the trial court abused its discretion or committed an error of law. The trial court's refusal to remove the nonsuit will be affirmed where the standard applicable to the entry of a nonsuit was properly applied: the plaintiff must be given the benefit of all evidence favorable to him or her, together with all reasonable inferences which arise from that evidence. Any conflict in the evidence must be resolved in favor of the plaintiff. A nonsuit will be entered only in clear cases—an order granting a nonsuit is proper only if the jury, viewing the evidence in the light most favorable to the plaintiff, could not reasonably conclude that the elements of the cause of action had not been established. *Kuriger v. Cramer*, 345 Pa.Super. 595, 602, 498 A.2d 1331, 1334–1335 (1985).

■ The Gauls' case is based in part on the contention that Richard was in fact within a permissive crossing when he was struck, and therefore that the duty owed to him would have been similar to that owed to a person within a regular railroad crossing: "A permissive crossing is a defined footpath leading to a crossing over railway tracks which is being habitually used, and which places upon the railway company the duty of care comparable to that required at a regular crossing." *Hamley v. George*, 365 Pa. 543, 548, 76 A.2d 181, 183 (1950). The Gauls argue that

there was sufficient evidence presented to permit a jury to determine that a permissive crossing existed at the point at which Richard was seen lying on the tracks. They contend that the trial court erred in granting a nonsuit on these grounds. In order to determine whether the trial court properly granted the nonsuit, we must examine how the supreme court of this Commonwealth, and this court, have defined permissive crossings.

In *Henry v. Pennsylvania Railroad Co.*, 368 Pa. 596, 84 A.2d 675 (1951), the supreme court defined a permissive crossing as an express or implied license to pass over the property of another, in this case, to pass over property of the railroad company. The crossing must be restricted to a well-defined location, and must be shown to be used frequently, notoriously, and continuously by the public. *Id.*, 368 Pa. at 600, 84 A.2d at 677; *see also Conn v. Pennsylvania Railroad Co.*, 288 Pa. 494, 502, 136 A. 779, 781 (1927). The court stated that "it is essential that the location of the permissive way be well defined." *Id.*; *Conn*, 288 Pa. at 502, 136 A. at 781. In *Conn v. Pennsylvania Railroad Co., supra*, that court had also made clear that the nature of the crossing must be public; it was not sufficient to show that boys going to and from activities in a city park located near the tracks used the way. *Conn*, 288 Pa. at 502, 136 A. at 781.

The determination of whether or not a permissive crossing exists is one to be made on the facts of each case. *See, e.g., Shaw v. Pennsylvania Railroad Co.*, 374 Pa. 8, 11, 96 A.2d 923, 925 (1953) (permissive crossing found to exist where there was evidence of long-used, well-beaten, well-defined footpath leading from the east to tracks, and similar path leading from tracks to the west); *Henry*, 368 Pa. at 598, 84 A.2d at 676 (permissive crossing existed where planks were laid across railroad tracks to permit cars to pass over them, part of abutment leading to tracks was covered with ashes to build up rough roadway leading to tracks, photograph was introduced into evidence showing ruts worn into ground making rough roadway up to tracks, testimony was presented that cars passed over tracks to

and from ball field adjacent to tracks, bulldozer had crossed in order to improve ball field, plaintiffs used crossing for coal business, and grocer used crossing twice a week for purpose of dumping garbage); *Echon v. Pennsylvania Railroad Co.*, 365 Pa. 529, 535, 76 A.2d 175, 178 & 178 n. 4 (1950) (permissive crossing existed where testimony indicated that hundreds of people had used crossing to travel between two streets for period of at least twenty years, photograph showing well-defined path was introduced into evidence); *Figard v. Pennsylvania Railroad Co.*, 361 Pa. 380, 382, 65 A.2d 411, 412–413 (1949) (permissive crossing existed where group of houses paralleled tracks, well-defined footpath led to tracks from houses, testimony was introduced showing persons habitually crossed tracks to gain access to mailboxes placed along public highway paralleling tracks, children used crossing to reach school bus stop for period of time sufficient for company to become aware of practice). *But see Conn*, 288 Pa. at 507, 136 A. at 783 (evidence showing that boys frequenting playing field went up and down embankment to reach spring or to run from other boys was insufficient to show public use constituting permissive crossing; no opening in fence separating tracks from field); *Scarborough by Scarborough v. Lewis*, 359 Pa.Super. 57, 61, 518 A.2d 563, 565 (1986) (evidence insufficient to indicate permissive crossing where it only showed hole in fence adjacent to railroad tracks and path down embankment leading to tracks).

In the instant case, the Gauls produced testimony to show that the operator of the train was aware that pedestrians frequently crossed the tracks in the area where Richard was struck. Dillon testified that he had been on that particular run for six years, and had seen persons crossing the tracks there "a couple times a week." Further, he testified that there was a beaten path in the woods in that area:

Q. Now, was there a path running off the side of the tracks near where you saw this person on the rail?

A. Well, that was a path off of the side of the track, but I don't know if it was near the person.

Q. You don't know if it was near the person?

A. No.

Q. Can you describe the path for us please? What did it look like?

A. Just an ordinary path that you would walk through, that's all.

Q. Was it a path through the woods?

A. Well, I don't know where it went to.

Q. I didn't ask you where it went to. I asked you what it went through. Was it through the woods, or—

A. It was up—you can see up to the top of the bank where it went through a grassy patch there and back in through. I don't know where it went.

Q. Was it a path that had been built, or was it a path that had been worn through through continuous use?

A. Worn from being used.

The trial court determined from this evidence that no permissive crossing existed in the area. Giving the Gauls the benefit of all favorable evidence, together with all reasonable inferences which arise from that evidence, we find that there was sufficient evidence to go to the jury on the question of whether or not a permissive crossing existed in the area. Dillon, the train engineer, testified that there was a path, worn from use, through the woods. Although his testimony only indicated a path on one side of the tracks, the supreme court has stated that this fact "would not affect the legal consequences flowing from the existence of a definite point of permissive crossing, it being wholly immaterial, if such a crossing existed, whether there was any distinct pathway beyond." *Figard*, 361 Pa. at 382, 65 A.2d at 413. Dillon also testified that he had seen persons crossing the tracks in that area several times a week over the six years he had worked for Conrail prior to the accident. This evidence details a crossing at least as explicitly as the evidence described by the court in *Shaw, supra*. Because a plaintiff should be nonsuited only upon the clearest grounds, the court should not have granted a nonsuit on these grounds.

■ This determination, however, does not resolve the instant appeal. The trial court also based its determination on its findings that Richard was lying between the tracks when the train hit him. The court stated that at the time Richard was struck by the train, he was not using the crossing in the manner in which the train company permitted its use. Conrail argues strenuously for this interpretation of the doctrine, claiming that the courts of this Commonwealth have always required the injured person to have been using the crossing as a crossing in order for the doctrine to apply. It claims that the case cited to us by the Gauls, *Figard v. Pennsylvania Railroad Co., supra*, for the proposition that a person need only be within the crossing to be protected, is inapposite here because in *Figard*, the supreme court was not called on to decide the issue of whether the injured child was using the crossing properly, but merely the factual question of whether a crossing existed.

An examination of the court's opinion in *Figard* shows that the court made no explicit determination of whether the child was using the crossing properly. There is no indication that the issue was even before the court. An examination of the case law in this Commonwealth is also uninstructive. No case deals with the precise factual situation we have before us. We note, however, that where a permissive crossing is found to exist, the person using the crossing is said to be a licensee of the railroad company. *See, e.g., Henry v. Pennsylvania Railroad Co.*, 368 Pa.Super. at 600, 84 A.2d at 677. A license is " 'a mere personal privilege to perform an act or series of acts on the land of another.' " *Kovach v. General Telephone Co.*, 340 Pa.Super. 144, 148, 489 A.2d 883, 885 (1985) (quoting *Dailey's Cheverolet v. Worster Realties, Inc.*, 312 Pa.Super. 275, 281, 458 A.2d 956, 960 (1983)). Any attempt to perform an act outside those permitted by the license operates to eliminate the privilege:

A licensee, however, can exercise only the rights and privileges granted by the license and must follow its

terms strictly; he is not protected or justified in doing acts which are not within its terms or necessarily incidental thereto, and is liable for the resulting damages if he exceeds the lisence or abuses his authority. Thus a license to go on land for one purpose does not justify an entry for another purpose. . . .

53 C.J.S. Licenses § 84, at 811 (1948); *see also* 62 Am.Jur.2d Premises Liability § 54, at 296 (1972) ("[A] licensee's privilege to enter land created by the consent of the occupier is terminated by the doing of any act, or the happening of any event, or the lapse of any specified period of time, by which the consent is restricted"). This reasoning has been applied by courts of other jurisdictions in determining that a railroad is not liable for injuries suffered by a party who exceeds the license extended by a permissive crossing by doing an act other than to crossing over the tracks. *See, e.g., Louisville & Nashville Railroad Co. v. Howard's Administrator,* 305 S.W.2d 305, 307 (Ky.1957) (although person may have a right to cross track at particular point under license from railroad, right confined to single purpose for which granted: movement across right of way); *Coonce v. Missouri Pacific Railroad Co.,* 358 S.W.2d 852, 859 (Mo.1962) (appellant fell asleep on tracks at place where he alleged public crossed, evidence of user did not place duty on defendant to keep lookout to discover man in plaintiff's position at place involved: "A path for use as a passageway on or along a railroad track is not an invitation to use the track for a place to sit or sleep"); *Kansas, Oklahoma & Gulf Railway Co. v. Wickliffe,* 201 Okl. 129, 133, 202 P.2d 423, 426 (1948) (even if deceased was licensee at beginning, it is conclusive that he had no license to sit or lie upon track, only right was to use privileges granted by the railroad). *See also* 2 Restatement of the Law (Second) of Torts, § 341.[2]

 We find, therefore, that under the permissive crossing theory, the injured person must have been using the crossing for the purpose for which the license was

**2.** § 341. Activities Dangerous to Licensees

given, that is, to cross the tracks. In the instant case, the operator of the train, John Dillon, described the position in which he saw Richard lying between the tracks: "[He was l]aying [sic] in the center of the track, his legs together, and its arms down by its side, laying [sic] straight, with his feet headed west and its head headed east, laying [sic] on his back." Had Richard's body been positioned in any other way, we might have been able to infer that he had fallen while in the act of crossing the tracks. Even if he had been in the act of crossing, and then decided to sleep in the middle of the tracks, such a decision would have been sufficient to remove him from the status of a licensee of Conrail. We cannot put a more favorable construction on this evidence; the composed attitude of the body as described by Dillon renders unreasonable any inference that the decision to lie in the middle of the tracks was anything but deliberate.[3] Giving the Gauls the benefit of all favorable evidence, and the reasonable inferences from that evidence, we cannot reasonably conclude that they have produced sufficient evidence to show that Richard was struck by a train while in the midst of crossing over a

A possessor of land is subject to liability to his licensees for physical harm caused to them by his failure to carry on his activities with reasonable care for their safety, if, but only if,

(a) he should expect that they will not discover or realize the danger, and

(b) they do not know or have reason to know of the possessor's activities and of the risk involved.

Comment:

\* \* \* \* \* \*

(b) Licensee to enter limited area ... One who is permitted to enter a particular part of the land for a particular time or a particular purpose becomes a trespasser if he enters another part of the land, or remains upon the land after that time has expired or for an unreasonable time after the purpose of the visit is accomplished.

Restatement of the Law (Second) of Torts, § 341 (1965).

3. Again we note that because Dillon was called as on cross-examination, his testimony is considered to be conclusive, unless rebutted or so inherently contradictory as to be unworthy of belief. See 42 Pa.C.S. § 5935; see also Estate of Keiper, 308 Pa.Super. 82, 89 n. 3, 454 A.2d 31, 35 n. 3 (1982). We do not find that the testimony was so inherently contradictory as to be unworthy of belief, and no evidence was offered by the Gauls to show that Richard was lying between the tracks in any other way.

permissive crossing. We find, therefore, that the nonsuit was properly granted.[4]

■ The Gauls' final contention is that regardless of the court's decision on the permissive crossing theory, the question of wanton or willfull misconduct should have been allowed to go to the jury.

Wanton misconduct ... "means that the actor has intentionally done an act of an unreasonable character, in

4. The Gauls argue that the presumption of due care which arises when a person is killed in an accident goes to prove that Richard was properly using the crossing when he was struck by the train. "When a person is killed in an accident, there is a presumption arising from general knowledge of the strength of the instinct of self-preservation and the natural desire to avoid pain and injury to one's self that the deceased at the time of the accident was exercising due care." *Yandrich v. Radic,* 291 Pa.Super. 75, 80, 435 A.2d 226, 229 (1981) (quoting *Rowles v. Evanuik,* 350 Pa. 64, 69, 38 A.2d 255, 257 (1944)), *appeal dismissed,* 499 Pa. 271, 453 A.2d 304 (1982). The function of the presumption is to place the burden of proof of a decedent's negligence on the party asserting that proposition. *Id.* It has no evidentiary value on behalf of either party. *Rice v. Shuman,* 513 Pa. 204, 212, 519 A.2d 391, 395 (1986); *Yandrich,* 291 Pa.Super. at 81, 435 A.2d at 229. As this court pointed out in *Yandrich,* its only effect is to invoke a rule of law compelling the jury to conclude that a decedent exercised due care in the absence of evidence to the contrary. *Yandrich,* 291 Pa.Super. at 81, 435 A.2d at 229.

The Gauls argue that the trial court erred in failing to present the issue of Richard's negligence to the jury along with the presumption that he had exercised due care at the time of the accident. They complain that the trial court presumed a lack of due care, which was legally incorrect. We find that the presumption does not come into play here, because the question of Richard's negligence plays no role in the determination that he abused his license to use the permissive crossing, and that, therefore, the Gauls have failed to establish that Conrail owed him a duty of care at that time and in that place. *See Rice,* 513 Pa. at 212 n. 5, 519 A.2d at 395 n. 5 (if plaintiff cannot establish that defendant's negligence is legal cause of injuries, nonsuit is proper). Because the presumption's function is to shift the burden of proof of the negligence of the plaintiff to the defendant, and the negligence of Richard is not at issue here, the presumption of due care is irrelevant.

Further, we note that had the case gone to a jury, the Gauls would not have been entitled to an instruction on the presumption of due care. There was evidence which contradicted that presumption: Richard was lying on his back between railroad tracks with his arms at his sides and his legs together, at night and in dark clothing. The jury would not then have been compelled to find that he acted with due care and an instinct for self-preservation.

disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences...." Prosser, Torts § 33 at 151 (2nd ed. 1955).

Other decisions of this court have recognized that *actual* prior knowledge of the injured person's peril need not be affirmatively established to constitute wanton misconduct.... [I]f the actor realizes *or* at least has knowledge of sufficient facts to cause a reasonable man to realize the existing peril for a sufficient period of time beforehand to give him a reasonable opportunity to take means to avoid the accident, then he is guilty of wanton misconduct if he recklessly disregards the danger.

*Evans v. Philadelphia Transport Co.*, 418 Pa. 567, 574, 212 A.2d 440, 443–444 (1965) (emphasis in original). The *Evans* court went on to discuss several cases in which an actor was held to have sufficient warning of the possibility of peril: *Geelen v. Pennsylvania Railroad Co.*, 400 Pa. 240, 161 A.2d 595 (1960) (actual knowledge can be inferred from circumstances); *Frederick v. Philadelphia Rapid Transit Co.*, 337 Pa. 136, 10 A.2d 576 (1940) (failure to practice due diligence might put operators on notice of peril); *Peden v. Baltimore & Ohio Railroad Co.*, 324 Pa. 444, 188 A. 586 (1936) (one cannot say he or she did not see what he or she must have seen); *Gray v. Pennsylvania Railroad Co.*, 293 Pa. 28, 141 A. 621 (1928) (existence of permissive crossing may bring home to operator existing peril).

■ Reckless disregard is defined, in turn, as the intentional doing of an act or failure to do an act, which the actor has a duty to do, knowing or having reason to know of facts which would lead a reasonable person to realize that his or her conduct not only creates an unreasonable risk of bodily harm to the other, but also involves a high degree of probability that substantial harm will result. *Stubbs v. Frazer*, 308 Pa.Super. 257, 260–261, 454 A.2d 119, 120–121 (1982) (citing 2 Restatement (Second) of the Law of Torts, § 500 (1965)). If the conduct involves a high degree of

chance that serious harm will result, the fact that the actor knows or has reason to know that another person is within the range of its effect is conclusive of his or her recklessness. Restatement at § 500, comment d; *Evans,* 418 Pa. at 575, 212 A.2d at 444.

The Gauls make the argument that because federal regulations require trains like the one that struck Richard to have headlights which will illuminate a person at least eight hundred feet ahead and in front of the headlights, *see* 49 C.F.R. § 229.125(a) (revised Oct. 1, 1987), the engineer should have been able to see Richard from eight hundred feet away rather than from the fifty to seventy-five foot distance at which he testified that he first saw an object on the tracks. Therefore, they argue, he cannot say that he did not see Richard at that distance. *See Haushalter v. Woodlawn & Southern Motor Coach Co.,* 407 Pa. 65, 68, 180 A.2d 10, 11 (1962) (one cannot be heard to say that he or she looked and failed to see that which he or she must have seen had he or she looked), and since he must have seen Richard at that distance, he should have been able to stop the train. The Gauls argue that he was therefore guilty of wanton misconduct.

We note that the regulation cited to us by the Gauls was revised as of October 1, 1987. The rule in effect in 1980 required a headlight of sufficient illumination to enable a crew member in the cab to see a dark object as large as a man of average size at a distance of at least 800 feet in front of the headlight. *See* 49 C.F.R. § 230.231(a) (1978); *see also Marshall v. Burlington Northern, Inc.,* 720 F.2d 1149, 1151 (9th Cir.1983). Although this is essentially similar to the present regulation, the manner of describing the thing which is to be seen under the illumination of the headlight is significant. Clearly, by describing what is to be seen as an object as large as a man of average size, the regulation intends that the headlight shall illuminate something upright in the path of the train, rather than a recumbent figure. One does not normally think of the average size of a man as his height when lying down. If the regulation were meant to illuminate things lying on the

tracks, it seems likely that different language would have been chosen to describe their size.

Further, a person is not generally seen lying down on or between railroad tracks, and nothing in the regulation states that the lights must be angled to illuminate the track bed. Common sense indicates that the regulation was meant to prevent accidents involving the most common activity practiced by human beings along or on railroad tracks, that of walking or crossing. Richard was doing neither, he was recumbent between the tracks. Under any reasonable construction of the regulation, the headlights of the train were not required to illuminate him. The regulation is of no help to the Gauls in making out their case of wanton misconduct against Conrail.

Considering all the evidence presented in conjunction with the claim that there was wanton or willful misconduct on the part of the train operator, we find that accepting all evidence in the Gauls' favor, and granting them all possible reasonable inferences, there was insufficient evidence to present to the jury. The trial court did not err in failing to allow this claim to go to a jury.

Affirmed.