681 A.2d 757

**Marcia TIBURZIO–KELLY and Francis Tiburzio, Individually and on Behalf of Their Minor Daughter, Lauren Rose Tiburzio, Appellants,**

**v.**

**Bruce MONTGOMERY, M.D., Thomas D. Mull, M.D., Anesthesia Associates of Bryn Mawr, Bryn Mawr Hospital, Appellees.**

Superior Court of Pennsylvania.

Argued June 7, 1995.

Filed July 15, 1996.

Reargument Denied Sept. 27, 1996.

David A. Yanoff, Philadelphia, for appellants.

Kevin H. Wright and Francis J. McGovern of Blue Bell, for appellee Bruce Montgomery, M.D.

Barbara Magen, Philadelphia, for appellees Thomas D. Mull, M.D. & Anesthesia Assoc. of Bryn Mawr.

Mary E. Nepps, Philadelphia, for appellee Bryn Mawr Hospital.

Before McEWEN, TAMILIA and KELLY, JJ.

KELLY, Judge.

This appeal is brought from an order of the Court of Common Pleas of Montgomery County granting appellant Lauren Tiburzio's request for a new trial,[1] and denying the remaining appellants' claims for post-trial relief. We reverse in part and affirm in part.

All parties to this appeal agree to one immutable fact: appellant, Marcia Tiburzio–Kelly, delivered a baby (Lauren Tiburzio) by emergency caesarian delivery without the benefit of general or epidural anesthesia. The how, why, and wherefore of this occurrence, and the resultant damage to the appellants, is the *sine qua non* of this case.

On July 20, 1983, at 7:00 p.m., appellant Marcia Tiburzio–Kelly[2] was admitted to Bryn Mawr Hospital. She was pregnant and was experiencing labor symptoms. Dr. Bruce Montgomery was the attending obstetrician. At 7:15 p.m., an initial examination of Mrs. Tiburzio–Kelly was conducted and a fetal heart rate of one hundred, sixty-four beats per minute was detected. Mrs. Tiburzio–Kelly was checked again at 8:00 p.m.

1. In light of the grant of post-trial relief to appellant Lauren Tiburzio, this appeal is technically interlocutory; it was nonetheless deemed appropriate for review under Pa.R.A.P. 341(c).

2. By the time of the trial, Marcia and Francis Tiburzio had divorced and Marcia Tiburzio had remarried.

at which time a fetal heart rate of one hundred, sixty beats per minute was detected. At 8:40 p.m., another check revealed a fetal heart rate of one hundred, twenty beats per minute, which is at the low end of a normal fetal heart rate. Because of the decline in the heart rate, a fetal monitor was placed on Mrs. Tiburzio–Kelly which could continuously monitor the fetal heart rate. By 8:47 p.m., the heart rate had dropped to between sixty and eighty beats per minute. The attending nurse immediately called Dr. Montgomery who was in the doctors' lounge removing surgical garb which he had worn during a recently completed procedure.

Within five minutes of receiving the nurse's call, Dr. Montgomery appeared in Mrs. Tiburzio–Kelly's room and began a full examination. By 8:56 p.m., Dr. Montgomery had ordered Mrs. Tiburzio–Kelly to be moved to a "labor room." In the next ten minutes, Dr. Montgomery attempted to deliver the baby vaginally. By 9:07 p.m., Dr. Montgomery called for caesarian section surgery and gave orders to call anesthesia, and two additional surgeons, as well as to prepare the "delivery room" for surgery. Mrs. Tiburzio–Kelly was placed in the "delivery room" for preparation while Dr. Montgomery prepared for surgery by "scrubbing" and donning surgical garb. By the time the patient and doctor were prepared, no anesthesiologist appeared.

Initially, Dr. Montgomery decided to wait for the anesthesiologist, but after an undetermined but nonetheless short period of time, he began the operation using local anesthesia. This decision required him to cut into Mrs. Tiburzio–Kelly while she was fully conscious, and required him to anesthetize each progressive layer of the abdomen before each incision. Lauren Rose Tiburzio was born at 9:34 p.m. Approximately seven minutes later, an anesthesiologist, Dr. Thomas Mull, arrived and administered appropriate anesthetic to permit the doctors to complete the operation on Mrs. Tiburzio–Kelly.

Lauren Rose Tiburzio was born with complications. Testimony indicated that she had suffered from oxygen deprivation during her last hours *in utero*. As a consequence, she suffered and continues to suffer from a seizure disorder, and has

a reduced mental capacity which borders on mental retardation (I.Q. 74).

Lauren Tiburzio and her parents brought suit against Dr. Montgomery, Dr. Mull, Bryn Mawr Hospital, and Anesthesia Associates of Bryn Mawr, asserting a number of claims including but not limited to negligence, negligent infliction of emotional distress and loss of consortium. Dr. Mull was dismissed as a defendant and, after a lengthy trial, the jury returned a verdict absolving Dr. Montgomery and Anesthesia Associates of Bryn Mawr of all liability. The jury awarded Mrs. Tiburzio–Kelly twenty-five thousand dollars on her claim against Bryn Mawr Hospital, and failed to reach a final verdict on Lauren Tiburzio's claim against Bryn Mawr Hospital. Mr. Tiburzio's claims of loss of consortium and negligent infliction of emotional distress were denied. Upon consideration of post-trial motions, the trial court granted a new trial to Lauren Tiburzio against Bryn Mawr Hospital only.

This appeal followed in which appellants have raised the following issues:[3]

1) WHETHER THE TRIAL COURT ERRED IN PRECLUDING APPELLANTS FROM GOING FORWARD AGAINST DEFENDANT ANESTHESIA ASSOCIATES AS A UNIQUE AND SEPARATE ENTITY.

2) WHETHER THE TRIAL COURT ERRED IN LIMITING THE SCOPE OF APPELLANTS' EXPERT WITNESS' TESTIMONY REGARDING THE NEGLIGENCE OF ANESTHESIA ASSOCIATES.

3) WHETHER THE TRIAL COURT ERRED IN PRECLUDING APPELLANTS' COUNSEL FROM CROSS–EXAMINING DEFENDANT'S EXPERT WITNESS REGARDING REPRESENTATION BY DEFENSE COUNSEL IN OTHER MATTERS.

4) WHETHER THE TRIAL COURT ERRED IN PRECLUDING APPELLANTS' OBSTETRICS EXPERT

---

**3.** We have listed these issues in the order in which we will discuss them.

FROM TESTIFYING AS TO SPECIFIC TIME RE-
QUIREMENTS FOR COMMENCING A CAESARE-
AN SECTION PROCEDURE.

5) WHETHER THE TRIAL COURT ERRED IN PER-
MITTING THE CROSS–EXAMINATION OF AP-
PELLANTS' OBSTETRICS EXPERT REGARDING
PAST INCOME FOR HIS SERVICES AS AN EX-
PERT WITNESS.

6) WHETHER THE TRIAL COURT ERRED IN PRE-
CLUDING CROSS–EXAMINATION OF DEFEN-
DANTS' EXPERT WITNESS REGARDING TIME
ESTIMATES FOR INDUCING ANESTHESIA FOR
A CAESAREAN PROCEDURE.

7) WHETHER THE TRIAL COURT ERRED IN
CROSS–EXAMINING APPELLANTS' EXPERT
WITNESSES.

8) WHETHER THE TRIAL COURT IMPUGNED THE
CREDIBILITY OF APPELLANTS' TRIAL COUN-
SEL.

9) WHETHER THE TRIAL COURT ERRED IN DE-
NYING APPELLANTS' REQUEST TO HAVE A
WITNESS WHO WAS EMPLOYED BY DEFEN-
DANT HOSPITAL DECLARED A HOSTILE WIT-
NESS.

10) WHETHER THE TRIAL COURT ERRED IN RE-
FUSING TO CHARGE THE JURY THAT NURSES
EMPLOYED BY DEFENDANT HOSPITAL COULD
SIMULTANEOUSLY BE ACTING AS AGENTS OF
DEFENDANT DOCTORS.

11) WHETHER TRIAL COURT ERRED IN DISMISS-
ING MR. TIBURZIO'S CLAIMS FOR LOSS OF
CONSORTIUM AND NEGLIGENT INFLICTION
OF EMOTIONAL DISTRESS.

12) WHETHER THE TRIAL COURT ERRED IN RE-
FUSING TO CHARGE THE JURY ON MARCIA
TIBURZIO'S CLAIMS FOR "LOSS OF LIFE'S

PLEASURES, EMBARRASSMENT, AND HUMILI-
ATION."

There is sufficient merit to the first three issues to warrant the grant of a new trial. However, for the reasons discussed below, we find no merit to the remaining issues.

Appellants' first two issues may be examined together. Prior to the commencement of trial the trial judge, in response to a defense motion *in limine,* ruled that appellants could not proceed directly against defendant Anesthesia Associates of Bryn Mawr for its negligence as a separate entity, but instead must proceed against it vicariously by establishing the negligence of its employees. The basis for the trial court's ruling was its determination that the fair import of appellants' expert reports did not apprise defendants of a claim against the Anesthesia Associates itself but rather criticized the actions of the individual physicians involved.[4] We disagree.

 Rulings on the admission and exclusion of evidence are within the discretion of the trial judge and will not be reversed on appeal absent a manifest abuse of that discretion.

4. The trial court, in its opinion, explained its ruling as follows:

 Plaintiffs' contention stems from the court's granting of defendants' Motion in Limine to preclude evidence of primary liability on the part of Anesthesia Associates. The court's ruling was based on the fact that plaintiffs' proposed expert testimony did not include any primary theory of liability against Anesthesia Associates: "The opinions offered here and statements made in my reports of February 7 and April 2, 1990, regarding such practices and policies for anesthesia coverage at Bryn Mawr ... constitute departures from the accepted standards of anesthetic medical care by the hospital, *first call anesthesiologists* and nursing staff." June 1, 1990 Report of Dr. Richard Raker. (emphasis added)

 While Dr. Raker's written report clearly implicated the first call anesthesiologist, and thus, vicariously, Anesthesia Associates, the court determined that allowing Dr. Raker to attack Anesthesia Associates directly at trial would go beyond the fair scope of his written reports, as prohibited by Rule 4003.5 of the Pennsylvania Rules of Civil Procedure, and would unfairly prejudice defendants. Pa.R.C.P. 4003.5(i). Because plaintiffs offered no expert reports indicating negligence on the part of Anesthesia Associates, other than vicariously through the actions of the individual anesthesiologists, the court properly ruled to preclude such testimony at trial.

 *Tiburzio–Kelly, et al. v. Montgomery, et al.,* Ct. of Common Pleas of Montgomery County, No. 85–10411, slip opinion at pp. 4–5, 22 Pa. D. & C.4th 1.

*General Equipment Manufacturers v. Westfield Insurance Company,* 430 Pa.Super. 526, 543, 635 A.2d 173, 182 (1993), *allocatur denied,* 537 Pa. 663, 644 A.2d 1200 (1994). The admission of expert testimony is a matter within the sound discretion of the trial court, and appellate review of the trial court's action is similarly and correspondingly limited. *Estate of Pew,* 409 Pa.Super. 417, 424, 598 A.2d 65, 69 (1991), *allocatur denied,* 530 Pa. 645, 607 A.2d 255 (1992) (citing *Mitchell v. Randall,* 368 Pa.Super. 421, 426–27, 534 A.2d 508, 510 (1987)). The decision of the trial judge on the question of the admissibility of expert testimony will not be reversed, remanded, overruled, or disturbed by an appellate court unless there was a clear abuse of discretion or a clear error. *Estate of Pew, supra* (citing *Mitchell v. Randall, supra*). However, that discretion is not unlimited, and where the ruling of a trial court exceeds those limits and a party is prejudiced thereby, reversible error occurs. *See Swartz v. General Electric,* 327 Pa.Super. 58, 71, 474 A.2d 1172, 1178 (1984).

 "Experts may testify at trial concerning matters which are within the fair scope of a pretrial report. The avoidance of unfair surprise to an adversary concerning the facts and substance of an expert's proposed testimony is the primary purpose of the rule requiring that testimony be within the fair scope of the pretrial report." *Pascale v. Hechinger Company of Pennsylvania,* 426 Pa.Super. 426, 435, 627 A.2d 750, 754 (1993) (citations omitted).

 In *Wilkes–Barre Iron & Wire Works, Inc. v. Pargas of Wilkes–Barre, Inc.,* 348 Pa.Super. 285, 502 A.2d 210 (1985), this Court noted:

it is impossible to formulate a hard and fast rule for determining when a particular expert's testimony exceeds the fair scope of his or her pretrial report. Rather, the determination must be made with reference to the particular facts and circumstances of each case. The controlling principle which must guide is whether the purpose of Rule 4003.5 is being served. The purpose of requiring a party to

disclose, at his adversary's request, "the substance of the facts and opinions to which the expert is expected to testify" is to avoid unfair surprise by enabling the adversary to prepare a response to the expert testimony. (Citations omitted).

In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, *the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.*

*Id.* at 290, 502 A.2d at 212–213.

Thus, in determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report "provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness." *Hickman v. Fruehauf Corporation,* 386 Pa.Super. 455, 459, 563 A.2d 155, 157 (1989), *appeal denied,* 528 Pa. 611, 596 A.2d 158 (1991) (citation omitted). The trial court must also inquire "whether there has been surprise or prejudice to the party which is opposing the proffered testimony of the expert, based upon any alleged deviation between the matters disclosed during discovery, and the testimony of such expert at trial." *Trent v. Trotman,* 352 Pa.Super. 490, 502, 508 A.2d 580, 587 (1986). "What constitutes surprise and prejudice, however, depends upon the pre-trial particulars of each case." *Augustine by Augustine v. Delgado,* 332 Pa.Super. 194, 199, 481 A.2d 319, 321 (1984).

*Walsh v. Kubiak,* 443 Pa.Super. 284, 292–93, 661 A.2d 416, 420–21 (1995)(emphasis supplied). *Accord Pascale v. Hechinger Co. of Pennsylvania,* 426 Pa.Super. 426, 435, 627 A.2d 750, 754 (1993); *Greer v. Bryant,* 423 Pa.Super. 608, 615, 621 A.2d 999, 1003 (1993).

174

■ We are convinced that the expert reports of Dr. Raker, dated February 7, 1990,[5] April 2, 1990,[6] and June 1, 1990,[7]

5. The expert report of February 7, 1990 recites in relevant part:
 SUMMARY
 This patient underwent Caesarian Section under *Local Anesthesia* administered by the Obstetrician for at least fifteen minutes. Despite multiple attempts, procedures and individuals, an Anesthesiologist then began successful *General Endotracheal Anesthesia.*
 DISCUSSION
 *The Rules and Regulations, Service of Anesthesiology,* Section 5.1 specifies that twenty four hour coverage is provided for surgical, medical and obstetrical emergencies. Section 5.2 specifies the responsibilities of the anesthesiologist on first call and the provisions for active laboring patients. Section 5.5 specifies the responsibilities of the first call anesthesiologist specifically relating to assignment of emergency surgical and obstetrical cases.
 The Service of Anesthesiology at Bryn Mawr Hospital had clear guidelines for their staff members. The on call anesthesiologist was responsible not only [for] his own cases, but more specifically [for] the assignment of emergency cases. In addition, unless the Rules and Regulations were changed at some other time, the presence of an actively laboring patient assumed an anesthesiologist in house.
 However specific the Service of Anesthesiology was, there was an *assumed* involvement of the staff of the Operating Room and the Labor/Delivery room. Unless there were specific written Nursing guidelines, procedures or policies describing how the Nursing staff would relay the assignment of another anesthesiologist (e.g. paging, calling, notifying), confusion would ensue.
 IMPRESSION
 Although there were written Rules and Regulations delineating the responsibilities of the Service of Anesthesiology, the actual implementation of such policies were unclear leading to confusion in the assignment of the anesthesiologist for the emergency obstetrical patient.

6. The supplemental report of April 2, 1990 recounts in pertinent portion:
 Although there were written Rules and Regulations delineating the responsibilities of the Service of Anesthesiology, the actual implementation of such policies was unclear leading to confusion in the assignment of the Anesthesiologist for the emergency obstetrical patient. This carelessness by the first call Anesthesiologist to conduct ordinary care for the patient as spelled out by the Rules and Regulations was avoidable even in light of the emergency circumstances of this case.

7. The supplemental report of June 1, 1990 opines:
 Although there were written Rules and Regulations delineating the responsibilities of the Service of Anesthesiology, the actual implementation of such policies was unclear leading to confusion in the assignment of the Anesthesiologist for the emergency obstetrical

particularly those portions of his reports which indicated that the anesthesiology service had no written guidelines in place for notification of the second call anesthesiologist by the staff, when read in light of the pleadings, were sufficient to apprise the defendant Anesthesia Associates of the precise nature of the allegations against which it was required to defend. The defendant, Anesthesia Associates, was aware of the opinion held by the expert of appellants, Dr. Raker, that the arrangements in place between Bryn Mawr Hospital and Anesthesia Associates were improper as "there was an *assumed* involvement of the staff of the Operating Room and the Labor/Delivery room. Unless there were specific *written Nursing guidelines, procedures or policies describing how the Nursing staff would relay the assignment of another anesthesiologist* (e.g. paging, calling, notifying), confusion would ensue." Anesthesia Associates was also aware of the fact that the appellants' expert believed that the failure to provide a system for obtaining back-up anesthesiologists was a breach of the duty of care owed by the "Service of Anesthesiology". The "Service of Anesthesiology" in the instant case *was* appellee Anesthesia Associates pursuant to an agreement between appellee Anesthesia Associates and the Bryn Mawr Hospital which provided *inter alia:*

REGULATIONS AND PROCEDURES

5.1 The Service of Anesthesiology shall provide 24 hour coverage for emergencies—surgical, medical, or obstetrical. Each member of the Service shares responsibility for maintaining coverage. All members share night and weekend coverage according to a regular schedule of rotation.

5.2 Subject to authority of the Chief of Service, daily operation is the responsibility of the anesthesiologist on first call; this assignment being established according to a regular schedule. An anesthesiologist leaving the hospital shall

patient. These opinions offered here and statements made in my reports of February 7, and April 2, 1990 regarding such practices and policies for anesthesia coverage at Bryn Mawr Hospital, were made to a reasonable degree of medical certainty and constitute departures from the accepted standards of anesthetic medical care by the Hospital, first call Anesthesiologist and nursing staffs.

so notify the anesthesiologist on first call. If an obstetrical patient is in active labor, the anesthesiologist covering the Delivery Room must remain in the hospital.

\* \* \* \* \* \*

AGREEMENT FOR PROFESSIONAL STAFFING: ANESTHESIOLOGY

(1) *Anesthesiology Services:* Associates shall provide anesthesia services in the Hospital for elective surgery normally requiring the administration of anesthesia by an anesthesiologist. Associates shall also provide anesthesia for obstetrical cases when requested and for non-elective and/or emergency cases on a 24–hour per day, seven days per week basis. Associates shall provide anesthesia for emergency and/or non-elective cases on an on-call basis to be determined by Associates, and such services shall always be arranged in such a way that there would be no unreasonable delay that would be detrimental to the care of the patient. The on-call system shall consist at a minimum of one Associate on first call and one Associate on second call.

Thus, the argument of Anesthesia Associates that it was unfairly surprised at trial by the testimony of Dr. Raker was not plausible and should not have been a basis for precluding plaintiffs' cause of action.

Appellants' third issue involves the refusal of the trial court to permit inquiry into the relationship between three of defendants' experts and the defense attorneys. The circumstances underlying this issue differ for each of the experts.

During the qualification stage of defense witness Dr. Ronald J. Wapner, appellants' counsel asked for a sidebar conference during which she requested a ruling from the trial court regarding the scope of allowable cross-examination. It was appellants' counsel's intent to cross-examine Dr. Wapner related to bias based on his relationship with the law firm representing Anesthesia Associates. That relationship derived from the law firm's representation of Dr. Wapner on twelve separate malpractice cases which were then current. The

trial court denied appellants' counsel's request to inquire into this area of bias.

Subsequently, defense counsel for Dr. Montgomery called Dr. Deurward L. Hughes to the stand to testify as an obstetrics expert. Prior to Dr. Hughes taking the stand, appellants' counsel sought permission to elicit from him the fact that he had been represented in his own malpractice case by the attorney who was now calling him as an expert. Once again, this request was denied.

Finally, defense counsel for Bryn Mawr Hospital called Dr. Lawrence Brown to the stand as an expert in pediatric neurology on behalf of the Hospital and Anesthesia Associates. Appellants' counsel sought permission to elicit from him the fact that he was then being represented by a member of the firm which was representing Anesthesia Associates. The request was denied.

 The law as it relates to an inquiry into an expert's bias was summarized by this Court in *Smith v. Celotex Corp.*, 387 Pa.Super. 340, 564 A.2d 209 (1989).

> In *Grutski v. Kline*, 352 Pa. 401, 43 A.2d 142 (1945), the Supreme Court established that impeachment of an expert witness by demonstrating partiality to the party for whom the expert is testifying is permissible. The Court stated:
>
>> Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination.... The fact that an expert witness is to receive, or has received, per diem compensation beyond the legal witness fee does not affect his competency as a witness, and it may have very slight bearing upon the question of his impartiality. Nevertheless, his relation to the party calling him may be such as to warrant the jury in taking it into consideration in weighing his testimony.
>
> *Id.* at 406, 43 A.2d at 144 (quoting *Duffy v. Griffith*, 134 Pa.Super. 447, 4 A.2d 170 (1939)). Thus, it is proper to elicit from an expert the fee he is being paid to testify. *Accord Zamsky v. Public Parking Authority of Pittsburgh*, 378 Pa. 38, 105 A.2d 335 (1954). Later decisions have

further indicated that it is also proper to elicit whether a personal friendship exists between the expert and either the party calling him or that party's counsel. *Downey v. Weston*, 451 Pa. 259, 301 A.2d 635 (1973).

*Id.* at 349–50, 564 A.2d at 213–14.

This Court held that it was not improper to allow inquiry into an expert's bias by permitting questions "regarding his specific involvement in asbestos cases on behalf of the defendants therein and the fees generated from them." The Court held that "[t]his information may be perceived as at least somewhat relevant to whether this expert was biased or prejudiced in favor of asbestos defendants." *Id.* at 352, 564 A.2d at 215.

■ In the present case, appellants sought to show a professional relationship, beyond the confines of this case, between the experts and the defense attorneys. Certainly, evidence of an ongoing relationship between the witnesses and attorneys is information which the jury would want to know about, and we believe is entitled to know about. *See Douglass v. Licciardi Construction Co.*, 386 Pa.Super. 292, 300, 562 A.2d 913, 917 (1989) ("A party is always entitled to explore the credibility of a witness and to expose *any* bias or interest which might affect the witness's [sic] testimony." (Emphasis added)).

Because the experts in question touched on aspects of each defendants' actions, the error committed by the trial court in restricting cross-examination will require the grant of a new trial as to all defendants, at least as far as their actions affected the causes of action brought by Lauren Tiburzio, and Mrs. Tiburzio–Kelly: for reasons discussed below, the causes of action brought by Mr. Tiburzio have been finally litigated.

■ Appellants' fourth issue is directed to the preclusion by the trial court of appellants' expert's attempt to quantify the time for deciding when an emergency caesarean section should be performed. This issue arose when appellants' expert, Dr. Stanley Warner, was being examined on direct by their counsel. Prior to the start of trial, defendants had been

provided with copies of reports issued by Dr. Warner. In the first report, he stated: "It took too long to perform a caesarian section." Warner Report, January 17, 1990.

In the second report, Dr. Warner expounded upon this sentence. He wrote:

A "STAT" cesarean section was decided upon. Despite this, need for immediate cesarean section, a cesarean section was not undertaken for some time. Dr. Mull, the anesthesiologist lists the cesarean section as being undertaken at 09:45 p.m. on 7/20/83. Robert Stavis, M.D. lists 09:34 p.m. as the baby's birth time. In either event, this is much too long to delivery and is well below the standard care.

It's obvious from the record, that Dr. Montgomery knew that the anesthesiologist was occupied. Nevertheless, he waited with the baby in severe fetal distress for anesthesia to come. It appears to me that it's probably a back-up anesthesiologist that did arrive. Dr. Montgomery had undertaken to start the cesarean section with local anesthesia sometime just before the anesthesiologist came in. He should have undertaken this much earlier with the knowledge he had....

... [I]f a cesarean section had been performed in a timely manner, this would have spared Lauren Rose Tiburzio from any further brain damage that took place after the point of fetal distress. Once again, both the hospital and Dr. Montgomery bear the responsibility for this. If appropriate care had been given by both Bruce Montgomery, M.D., and Bryn Mawr Hospital, Lauren Rose Tiburzio would not suffer the neurological damage that she suffers from today.

Warner Report, February 6, 1990. Nowhere in either report does Dr. Warner quantify the amount of time which would be indicative of what was the appropriate standard under the circumstances. Additionally, in neither report did Dr. Warner cite to an authoritative text or protocol which defined or qualified the appropriate period within which a doctor should make his decision.

At trial, appellants' counsel elicited from Dr. Warner clear and unambiguous testimony that Dr. Montgomery's treatment fell below the acceptable standard of care in that he failed to deliver the baby in "the most expeditious, most rapid route possible," (N.T. July 14, 1993, at 593), and the "timing" of Dr. Montgomery's request for a c-section team "did not meet reasonable standards." (*Id.* at 597). This testimony came in without objection. However, Dr. Warner attempted to testify that "in 1983 the standard of care said that you had fifteen minutes to be able to get . . ." at which point further testimony was cut off by defense counsel's objection. Thereafter, the attorneys' respective arguments were taken up at sidebar. The basis of Dr. Montgomery's objection was summarized by his attorney thusly:

> [DEFENSE COUNSEL:] This gentleman for the first time has now interjected in the case that the standard of care was to take a child in fifteen minutes once a cesarian [sic] was decided and that is nowhere in his report. He said, he should have done it sooner. Your Honor, it does not say fifteen minutes was the standard anywhere in either report.

(*Id.* at 599). After some discussion, appellants' counsel summarized her position in support of allowing Dr. Warner to quantify the time period:

> [APPELLANTS' COUNSEL:] The entire case is about the timing of the cesarian [sic] section delivery; the entire case is about the timing of the arrival of anesthesia with respect to the cesarian section delivery. It is very clear that experts do not have to cite the sources upon which they rely in the medical literature in order to offer this opinion.

(*Id.* at 601). At the close of the attorneys' discussion, the trial judge ruled:

> [JUDGE:] I'm going to tell the jury that they are to disregard anything with regard to the standard of care as to the time, disregard any specific minutes because that's not

in his report. But he can indicate whether it was reasonable time constraints.

(*Id.* at 602). It is this ruling which is now being challenged.

A resolution of this issue is governed by the same legal principles set out in our discussion regarding appellants' first two issues. Thus, in determining whether an expert's in-court testimony is at a fatal variance with his pretrial report "[t]he question to be answered is whether under the particular facts and circumstances of the case, the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." *Wilkes–Barre Iron & Wire Works, Inc. v. Pargas of Wilkes–Barre, Inc., supra* at 290, 502 A.2d at 213.

Appellants' expert was permitted to testify that Dr. Montgomery did not operate in a timely manner. Moreover, he was repeatedly permitted to testify about the various errors in judgment which he ascribed to Dr. Montgomery. However, Dr. Warner's attempt to introduce an objective standard as a benchmark, the use of which may or may not have been subject to debate, constituted a significant discrepancy from his pretrial report, and defense counsel was entitled to be on notice that this was the standard at issue. Because that standard was not revealed to defense counsel as the basis of Dr. Warner's opinion, we detect no abuse of discretion in the trial judge's decision to limit Dr. Warner's testimony to his subjective opinion as enunciated in his report.[8]

Appellants' fifth issue also involves Dr. Warner, and arises from the refusal of the trial court to limit defense counsel's

8. We are compelled to comment on appellants' argument that defense counsel was permitted to testify about an objective standard of thirty minutes as being the appropriate time within which to perform a caesarean section. (*See* N.T. July 20, 1993, at 1277). This testimony was elicited without objection and came in six days after the trial judge ruled on the admissibility of Dr. Warner's use of an objective standard. Although the introduction of Dr. Wapner's testimony would have made Dr. Warner's testimony admissible on rebuttal, appellants' counsel never sought to introduce it.

inquiry into the doctor's financial incentive for testifying. Again, we detect no abuse of discretion in the trial judge's ruling.

■ Appellants' counsel, in her attempt to qualify Dr. Warner as an expert, pursued the following line of questioning:

Q. [PLAINTIFFS' COUNSEL:] ... Do you charge for your time.

A. [DR. WARNER:] Yes.

Q. All right. Where does the money go?

A. The money currently goes to the Blockton Valley Community Health Care which is the neighborhood health center that I work for and have taken care of the indigent that I have talked about.

Q. Do you personally profit from any money or revenue which is generated in payment for your time in assisting attorneys and their clients with respect to these kinds of matters?

A. At the current time, no.

(N.T. July 14, 1993, at 559–560). In cross-examination of Dr. Warner's qualifications, defense counsel for Dr. Montgomery, over the objections of appellants' counsel, was able to establish that Dr. Warner's policy of turning over fees was a relatively recent development, and that during the year that the two reports in issue were authored (i.e. 1990), Dr. Warner was paid in excess of $100,000.00 for his services as an expert.

■ In support of their contention that the trial court erred in permitting defense counsel's cross-examination on this point, appellants rely on this Court's decisions in *Mohn v. Hahnemann Medical College and Hospital,* 357 Pa.Super. 173, 515 A.2d 920 (1986) and *Leaphart v. Whiting Corp.,* 387 Pa.Super. 253, 564 A.2d 165 (1989). In *Mohn v. Hahnemann Medical College and Hospital, supra,* which was relied upon in part by this Court in *Leaphart v. Whiting Corp., supra,* the Court held that it was reversible error to permit cross-examination of an expert witness regarding compensation he received for "*all* services rendered" where the connection

between those services "and his credibility is tenuous at best." *Mohn v. Hahnemann Medical College and Hospital, supra* at 181, 515 A.2d at 925. Significantly, *Mohn v. Hahnemann Medical College and Hospital, supra,* did not announce a *per se* rule regarding the extent of permissible cross-examination into a witness' potential bias, and reiterated the rule that "[b]ias or interest of a witness in a dispute which may affect his or her credibility is a proper subject for impeachment." *Id.* (citing *Price v. Yellow Cab Co.,* 443 Pa. 56, 278 A.2d 161 (1971)).

In the present case, the fact that Dr. Warner was keeping as income the money received from the preparation of the two reports was relevant to show bias. Additionally, because appellants' counsel opened the door to Dr. Warner's altruism, defense counsel was properly permitted to inquire about the extent or history of that virtue.

Next, appellants argue the trial court erred by placing unwarranted limitations on their cross-examination of Anesthesia's expert, Henry Rosenberg, M.D. Appellants argue they were wrongfully precluded from asking questions designed to impeach or contradict the prior testimony of Anesthesia's own Dr. Mull, and from posing questions challenging the recognized use of local anesthesia for caesarean sections.

As to the first part of appellants' argument, the record indicates Rosenberg's testimony estimated the amount of time it takes for the anesthesiologist to complete the necessary steps to anesthetize a patient from the moment he walks into the operating room until surgery may commence. (N.T. July 19, 1993, at 1189–1190). In that regard, he testified that the relevant time period was three to four minutes. Mull, however, testified with regard to the amount of time it takes for a patient to be put under general anesthesia once an intravenous line has been started and the patient has been injected with Pentothal or Ketamine. (N.T. July 9, 1993, at 266–267). That time period was six to eight seconds. Each physician was describing and assigning a time frame to a different step or phase in the anesthetizing procedure com-

monly employed for a caesarean section. While Mull's "matter of seconds" related to the time it took for the medication to render a patient unconscious, Rosenberg's estimate of three to four minutes described the time necessary to prepare a patient so surgery may begin. Appellants' attempt to impeach Rosenberg's testimony employing that of Mull was improper and the court did not err by sustaining defendants' objection.

The second part of appellants' argument that their cross-examination of Rosenberg was unduly restricted asserts that their case was prejudiced irreparably by the court barring them from inquiring as to any differences between local and other forms of anesthesia. After appellants' counsel and Rosenberg agreed "anesthesia is essential for a caesarean section performed in the United States," counsel further asked, somewhat rhetorically: ". . . would you say there's just a sort of the slightest difference between the effects of general anesthesia and some injection of Carbocaine in the first few layers of the abdomen?" (N.T. July 19, 1993, at 1205–1206). Counsel for Anesthesia Associates objected to the question as being beyond the scope of direct and the court sustained the objection. Appellants' counsel, having conveyed to the jury her position by the tone of her question then decided not to further pursue this issue. It is somewhat disingenuous of her now to raise it as an appealable issue when she could have further attempted to pursue the line of questioning and chose not to.

Appellants' next issue is directed to alleged inappropriate conduct of the trial judge during the course of the trial. We find absolutely no merit to this contention.

In support of this issue, appellants argue that appellants' expert witnesses were subjected to court examination, whereas defense counsel witnesses were not. However, it is the content of the questions asked as opposed to the number of witnesses questioned which is the relevant inquiry. In this regard we will examine the two instances cited by appellants which they describe as constituting "improper advocacy and devastating discreditation of the expert's opinion."

In both instances, the jury was confronted with expert's future projections regarding the educability and employability of Lauren Tiburizo. The judge questioned both experts on the reliability of expert predictions in light of the vagaries of human experience which impact individual lives.

A trial judge has the right if not the duty to interrogate witnesses in order to clarify a disputed issue or vague evidence. *Carney v. Otis Elevator Co.*, 370 Pa.Super. 394, 401, 536 A.2d 804, 807 (1988). Unless the complaining party can establish the judge's questioning constituted an abuse of discretion, resulting in discernible prejudice, capricious disbelief or prejudgment, a new trial will not be granted. *Smith v. Barker*, 368 Pa.Super. 472, 478, 534 A.2d 533, 536 (1987). The judge's questions here were intended to insure that the jury understood the difference between established facts and fallible human predictions, and his questions along these lines were neither impermissible nor overreaching.

Appellants also argue that the trial judge made "numerous comments and expressions of frustration ... [which] served to undermine the credibility of plaintiffs' counsel in front of the jury." Despite the claim of "numerous" instances, appellants cite only two, and we will limit our analysis to those two. In the first instance, the judge uttered "I am constantly amazed" when appellants' counsel asked for a sidebar conference in response to a clear and unequivocal ruling by the court that a proposed line of questioning was impermissible. Counsel offered no support for this position but nonetheless proceeded in the face of the judge's ruling as if she was entitled to do so. In such a situation, the trial judge's expression of incredulity did not seem misplaced.

In the other instance, the judge suggested that trial counsel's questioning of her own witness beyond a certain point was tantamount to beating "a dead horse that's already laying on the ground taking its last gasp." (N.T. July 14, 1993, at 680). Counsel made no protest to this admonition except to say, "I'll accept the Court's cautionary instruction." (*Id.*). It should be noted that this exchange took place during

the second week of appellants' case, and after appellants' expert clearly established the point counsel was seeking to establish. Such an isolated and relatively benign comment does not support appellants' claim that counsel's credibility was undermined, especially in light of the fact that at the time it was delivered it drew neither counsel's objection nor protest.

Appellants' next issue is directed to the refusal of the trial court to permit her to cross-examine her own witness. Appellants' counsel called Dr. Robert L. Stavis as part of their case in chief. Dr. Stavis was a staff neonatologist at Bryn Mawr Hospital who had attended to Lauren Tiburzio within ten minutes of her birth. From the time of Lauren's birth up until the trial, Dr. Stavis remained on the staff at Bryn Mawr Hospital. Despite this availability appellants' counsel inexplicably never sought to obtain his statement or take his deposition. Moreover, in calling Dr. Stavis to the stand, counsel specifically stated that it was not her intention to call Dr. Stavis as on cross. Counsel's later protestations that she should have been allowed to cross-examine her own witness because of his known affiliation with the hospital and that defense counsel had questioned him during trial preparation, ring hollow at best.

It is within the discretion of the trial court whether to allow a party to cross-examine its own witness. *Harding v. Consolidated Rail Corp.*, 423 Pa.Super. 208, 224, 620 A.2d 1185, 1193 (1993); *Gaul v. Consolidated Rail Corp.*, 383 Pa.Super. 250, 254 n. 1, 556 A.2d 892, 893 n. 1 (1989), *allocatur denied*, 524 Pa. 621, 571 A.2d 383 (1989). The party requesting leave to declare its witness hostile bears the burden of proving statements made by the witness were unexpected, contradictory to earlier statements, harmful to the party calling the witness and would result in injustice should the movant's request be denied. *Dath v. Marano Truck Sales, Inc.*, 437 Pa.Super. 571, 574, 650 A.2d 901, 902 (1994); *Harding v. Consolidated Rail Corp., supra* at 224, 620 A.2d at 1193.

 A party may not cross-examine its own witness unless a plea of "surprise" is justified at the time of trial when a witness renders unexpected testimony, in direct contradiction with an earlier statement, that is harmful to the party. *Dath v. Marano Truck Sales, Inc., supra* at 574, 650 A.2d at 902; *Harding v. Consolidated Rail Corp.* at 224–225, 620 A.2d at 1193. A party's claim of surprise however, "is diminished when counsel did not previously interview the witness for a statement." *Selden v. Metropolitan Life Ins. Co.*, 157 Pa.Super. 500, 507–508, 43 A.2d 571, 575 (1945). Counsel in this case was the victim of her own decisions and was not entitled to the discretionary relief which she sought.

Appellants also contend the trial court erred by ruling the hospital nurses attending Tiburzio–Kelly were agents only of the hospital and not those of the attendant physicians, and by refusing to instruct on dual agency as to the hospital and the co-defendant doctors. Appellants argue Doctors Montgomery and Anderson's directive to the nurses to notify the second-call anesthesiologist that he was needed in surgery assigned a duty not routinely within the nurses' purview, thereby creating an agency relationship between doctor and nurse. In the alternative, appellants argue the Captain–of–the–Ship doctrine applies, at least to Dr. Montgomery.

 Under Pennsylvania law, nurses employed at a hospital are not agents of the physicians when they act in the normal course of hospital services. *Muller v. Likoff,* 225 Pa.Super. 111, 310 A.2d 303 (1973). The only two recognized exceptions to this rule are: 1) under the "Captain–of–the–Ship" doctrine, a surgeon may be held liable for the negligent acts committed during the course of the procedure of operating room personnel who are under his immediate control, *Szabo v. Bryn Mawr Hospital,* 432 Pa.Super. 409, 638 A.2d 1004 (1994); and 2) the physician is in control of the nurse by virtue of his physical presence in the room while treatment is being administered, or he actually employs the nurse and has the right to discharge her. *Muller v. Likoff, supra.* In this case, no testimony was elicited to support a finding the physicians had "control" over the nurses in question, especially

with respect to the manner in which the notice to the second anesthesiologist was to be executed; nor were the physicians in the position to hire or fire the nurses. At all times, the nurses in question were employees of the hospital and were expected to operate in conformance with hospital procedures. Indeed, it is the alleged breakdown of these procedures which is at the heart of this case. Thus, we conclude the trial court did not err by refusing to instruct on dual agency. *See Ferrick Excavating & Grading Co. v. Senger Trucking Co.,* 506 Pa. 181, 484 A.2d 744 (1984) (Whether a jury should be instructed a given point of law depends on the facts and issues of each case).

Appellants' next issue is addressed to Mr. Tiburzio's claim for loss of consortium. A loss of consortium claim arises from the marriage relationship and is grounded on the loss of a spouse's services after injury. *Sprague v. Kaplan,* 392 Pa.Super. 257, 258, 572 A.2d 789, 790 (1990); *Burns v. Pepsi–Cola Metropolitan Bottling,* 353 Pa.Super. 571, 576, 510 A.2d 810, 812 (1986). These losses result from the deprivation of the injured spouse's society and services. *Dasconio v. Workmen's Compensation Appeal Board,* 126 Pa.Cmwlth. 206, 220, 559 A.2d 92, 99 (1989).

In this case, Mr. Tiburzio offered no testimony regarding loss of spousal companionship or services. In fact, his testimony focused solely on his own subjective fear of engaging in sexual relations with his wife. He at no time indicated that Mrs. Tiburzio–Kelly caused or in any way refused to participate in the marriage as a result of the operation.

Although it might theoretically be possible for a party to state a cause of action for tortious interference with a marital relationship, that was not the cause of action which was pled here. Consequently, the trial court was correct in refusing to charge the jury on a theory of recovery for which no evidence was offered.

The next issue is also addressed to a claim brought on behalf of Mr. Tiburzio, *i.e.* his claim for negligent infliction of emotional distress and the concomitant refusal of the trial court to permit this cause of action to go forward. This is a

difficult issue to resolve for it bumps up to the edge of where the law of Pennsylvania has evolved on this issue. Unfortunately for appellant it does not cross the line into a viable cause of action, and we are constrained to agree with the trial court that no cause of action existed or could be proved.

 Mr. Tiburzio's testimony at trial indicated that he witnessed his wife's distress prior to delivery; that during delivery he was in a "birthing room" approximately forty to fifty feet from and out of sight of the delivery room; that he "heard [his wife] screaming unbelievable"; it subsequently became quiet; approximately twenty minutes after the screaming stopped, he was told by a laundress that he had "a beautiful girl"; thereafter, he saw his wife "about forty-five minutes later in the recovery room [after the] nurses cleaned her off, combed her hair and put a little bit of makeup on." Significantly, Mr. Tiburzio testified that he "had no idea Lauren came out like she did [and] had no idea that there was no anesthesiologist." (N.T. July 16, 1993, at 934–935).

 The elements necessary for the establishment of a cause of action for negligent infliction of emotional distress were set by the Supreme Court in 1979. A plaintiff must establish the following elements:

(1) he must be near the scene of the accident;

(2) his shock or distress must result from a direct emotional impact caused by the sensory or contemporaneous observance of the accident, as opposed to learning of the accident from others after its occurrence; and

(3) he must be closely related to the injured victim.

*Sinn v. Burd*, 486 Pa. 146, 170–71, 404 A.2d 672, 685 (1979).

In the case of *Neff v. Lasso*, 382 Pa.Super. 487, 555 A.2d 1304 (1989), this Court made clear that in certain circumstances the "sensory and contemporaneous observance" requirement of the second element could be satisfied by a plaintiff who *heard* an accident as opposed to being an eyewitness. *Id.* at 495–96, 555 A.2d at 1308. However, the Court was quick to note that "aural awareness may rarely, standing alone, give rise to a sufficient awareness of the nature and impact of the event to cause severe emotional impact," and

that the aural perception must be "considered together with prior and subsequent visual observance" in order to satisfy the requirement. *Id.* at 506, 555 A.2d at 1313–14.

Subsequently, this Court returned to the issue of what satisfied the contemporaneous observance requirement in the case of *Bloom v. Dubois Regional Medical Center*, 409 Pa.Super. 83, 597 A.2d 671 (1991). In *Bloom*, the victim had been voluntarily admitted to a psychiatric unit of a hospital. The following day her husband came to visit her and found her in the bathroom hanging by her neck in an obvious attempt to commit suicide. In refusing to permit recovery under a theory of negligent infliction of emotional distress, the Court noted:

> The gravamen of the observance requirement is clearly that the plaintiff in a negligent infliction case must have observed the traumatic infliction of injury on his or her close relative at the hands of the defendant. The Supreme Court has drawn a line between cases involving observation of a traumatic event which has an immediate impact on the plaintiff and those not involving the observation of a traumatic event and where there is some separateness between the negligence of the defendant and its ultimate impact on the plaintiff. The court's intent has clearly been to limit recovery for negligent infliction of emotional distress to those situations where the plaintiff suffers a direct harm of his or her own as a result of the defendant's conduct, and to find that this harm has been experienced only where the plaintiff has been directly and traumatically impacted by the defendant's tortious conduct. To recover the plaintiff must have observed the defendant traumatically inflicting the harm on the plaintiff's relative, with no buffer of time or space to soften the blow.

*Id.* at 104–05, 597 A.2d at 682. In this case, no such evidence existed. Mr. Tiburzio's sensory observation consisted of hearing alone. He was not aware of its cause and by the time he saw his wife, she was in the recovery room.

Appellants' last issue is addressed to whether the trial court erred in refusing to charge the jury on Mrs. Tiburzio–

Kelly's alleged "loss of life's pleasures, embarrassment and humiliation." This instruction was intended to put before the jury a claim for compensation for ongoing and future damages. The trial judge refused this proffered instruction for one simple reason: there had been no evidence introduced tending to support a claim on any of these bases. Mrs. Tiburzio–Kelly never testified that as a result of the operation being admitted under local anaesthesia she was embarrassed or humiliated. Moreover, appellants at all times agreed that a caesarean section operation was necessary and thus the operation itself was not a result of any negligence on the part of anyone. Given this fact, Mrs. Tiburzio–Kelly's recovery from the normal effect of having undergone a caesarean section operation (which would include an abdominal scar) could not be the basis for a recovery, and there was no evidence that Mrs. Tiburzio–Kelly's recovery was abnormal or that once she recovered, she was prevented from enjoying life's pleasures. In fact, at one point she testified that she was an active athlete and enjoyed doing things with Lauren, such as playing games. Absent sufficient evidence appellant was not entitled to have the jury consider a wholly speculative claim, and the trial judge was correct in refusing to instruct the jury on this issue.[9]

In light of our conclusion on appellants' first three issues, appellants Lauren Tiburzio and Marcia Tiburzio–Kelly are entitled to new trials. Insofar as the order of the Court of Common Pleas denied that request, it is reversed. In light of our conclusion on the remaining issues, Mr. Tiburzio's claims have been finally litigated and the order denying his request for a new trial is affirmed.

Order affirmed in part, reversed in part. Case remanded to the trial court for further proceedings consistent with this opinion.

TAMILIA, J., filed a dissenting opinion.

9. We note, however, that in instructing the jury on Mrs. Tiburzio–Kelly's claim for pain and suffering, the trial judge did include "distress" as one of the bases for recovery: "Mrs. Tiburzio [sic] is entitled to be fairly and adequately compensated for such physical pain, mental anguish, discomfort, inconvenience and distress as you may find she has endured...." (N.T. July 22, 1993, at 1579).

TAMILIA, Judge, dissenting:

Plaintiffs Marcia Tiburzio–Kelly and Francis Tiburzio, individually and on behalf of their minor daughter, appeal from the August 22, 1994 Order[1] granting a new trial against defendant Bryn Mawr Hospital, but denying in all other respects plaintiffs' post-trial motions. The majority has reversed in part and affirmed in part. I respectfully dissent to that portion of the majority's decision granting a new trial to Marcia Tiburzio–Kelly and her minor child, Lauren Tiburzio, as to all defendants.

In 1984, plaintiffs brought suit against defendants alleging professional negligence during the birth of their daughter, Lauren Rose. The defendants' negligence, according to appellants, centered on their failure to properly treat pregnant Tiburzio–Kelly during childbirth, resulting in the permanent physical and mental impairments of Lauren Rose. After a twelve-day trial, the jury found defendants Bruce Montgomery, M.D., Thomas D. Mull, M.D., and Anesthesia Associates of Bryn Mawr (Anesthesia) not liable. While the jury did find appellee Bryn Mawr Hospital negligent with regard to its treatment of Lauren Rose and Tiburzio–Kelly, it was unable to resolve the issue of causation with respect to Lauren Rose, and awarded only Tiburzio–Kelly $25,000 on her claim. Upon consideration of post-trial motions, the court granted a new trial, but only as against defendant Bryn Mawr and with respect to the issues of liability and the damages suffered by Lauren Rose. This appeal followed.

Appellants' first two issues challenge the propriety of the trial court's rulings on a pretrial motion in limine and the related expert testimony of plaintiffs' witness, Dr. Richard Raker. By granting defendants' motion in limine, the trial court ruled, based on its finding the experts' reports failed to include any primary theory of liability against Anesthesia, that the plaintiffs could proceed against Anesthesia only with re-

1. *See* Pa.R.A.P. 341(c). (When more than one claim for relief is presented or when multiple parties are involved, the trial court may enter a final, appealable Order as to one or more parties upon an express determination an immediate appeal would facilitate resolution of the entire case.)

gard to its possible vicarious liability for injuries incurred as a result of the actions of the individual anesthesiologists. As a consequence of this pretrial ruling, appellant argues, the trial court also improperly limited the scope of Raker's testimony concerning the negligence of Anesthesia, thereby committing reversible error.

Matters related to the admission or exclusion of evidence are entrusted to the sound discretion of the trial judge, whose decision will not be reversed absent an abuse of discretion or an error of law. *Kashner v. Geisinger Clinic,* 432 Pa.Super. 361, 638 A.2d 980 (1994). An expert's testimony must be limited to the fair scope of his report. Pa.R.C.P. 4003.5(c). Contrary to the majority's holding, no allegation of primary liability on behalf of Anesthesia had been made prior to trial. Raker's expert opinions, set forth in reports penned February 7, 1990, April 2, 1990 and June 1, 1990, averred departures from the accepted standards of anesthetic medical care by the hospital, the first call anesthesiologist and the nursing staff. No mention of or reasonable reference to appellee Anesthesia's direct or primary liability was alleged. Based on this fact, I believe that to allow Raker to testify regarding any direct liability by Anesthesia or its failure to comply with the accepted standard of anesthetic care would have improperly allowed Raker, the expert, to exceed the scope of his written reports offered during discovery. Moreover, as appellees argue and the trial court Opinion reasoned, the trial judge was more than generous in allowing Raker's testimony to oftentimes stray afield from his written reports and opine regarding the responsibility of Anesthesia for insuring the execution of the rules and regulations in place at Bryn Mawr (N.T., 7/13/93, pp. 410–419). I remain unconvinced the trial court's rulings so prejudiced the plaintiffs as to necessitate a new trial.

Next, appellants argue the trial court wrongfully refused to allow cross-examination of defense experts Drs. Hughes, Wapner and Brown regarding any potential bias. The bases of their alleged bias follow: Hughes was represented by defendant Montgomery's attorney on an unrelated matter; and Wapner and Brown were represented, also on unrelated mat-

ters, by the firm representing Anesthesia. The majority found the trial court erred by denying inquiries into the experts' possible bias, reasoning a professional relationship between the experts and the attorneys of record, albeit unrelated to the matter before them, was knowledge to which the jury was entitled. Once again, I disagree.

The trial court found such testimony would have been irrelevant and unduly prejudicial, and while the interest in or bias of a witness towards any party in a lawsuit may be exposed upon cross-examination, *Price v. Yellow Cab Co.*, 443 Pa. 56, 278 A.2d 161 (1971), the trial court does have discretion in determining at which point further cross-examination would be unproductive, *Downey v. Weston*, 451 Pa. 259, 301 A.2d 635 (1973), and may properly exclude such evidence if its probative value is outweighed by the danger of unfair prejudice or confusion of issues, *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584 (1984). I find plaintiffs' offer of impeachment evidence was properly excluded as irrelevant and as an extraneous, collateral matter.

With regard to the remaining issues raised by appellants, I concur with the majority's ruling finding those matters devoid of merit. I would affirm the Order granting a new trial only against defendant Bryn Mawr and as to the issues of liability and damages suffered by the minor child, Lauren Rose.